UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10038-MLW |
| | ) | |
| **DEEPAK JAHAGIRDAR** | ) | |

**Government's Opposition to Defendant's Motion to Suppress**

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully submits this opposition to defendant's motion to suppress evidence seized pursuant to his arrest. As outlined below, the defendant's motion should be denied because there was ample probable cause to arrest the defendant for interference with the operation of an aircraft and for a felonious sexual assault on that flight. In addition, the swabbing of the defendant's hands, and the scraping underneath his fingernails were a lawful search and seizure incident to his arrest, and were otherwise reasonable in light of the evanescent nature of the evidence and the minimal intrusion necessary to obtain it.

**Relevant Facts[1]**

On March 31, 2002, Victim D.S., a 22 year-old woman who resided in the Boston, Massachusetts metropolitan area, boarded Delta Air Lines Flight 2100 at the Dallas/Fort Worth, Texas airport. The flight, which departed at 1:30 p.m., was a non-stop flight from Texas to Boston's Logan International Airport.

---

[1] The facts outlined in this memorandum are drawn from the state grand jury testimony and reports filed by law enforcement officers in this case. If an evidentiary hearing on this motion is necessary, the government will rely on the evidence as presented at that hearing.

1

Victim D.S. was traveling alone. When she boarded the airplane she sat in a window seat, number 12E. A man, who was later identified to be the defendant, Deepak Jahagirdar, was already seated beside her in the aisle seat numbered 12D. Their row had only 2 seats.

Victim D.S. asked the flight attendant for a pillow and a blanket. Because she had very little sleep the night before, she was exhausted, and promptly fell asleep. Before falling asleep, she covered her legs with the blanket which had been provided to her.

Approximately an hour and a half into the flight to Boston, Victim D.S. was awakened from a deep sleep when she felt a hand on and in her vagina. She discovered that her pants were unbuttoned and partially unzipped (they were buttoned and zipped when she fell asleep), and that Jahagirdar's hand was in her pants, under her underwear, and she could feel his finger penetrating her vagina. Victim D.S. also discovered that Jahagirdar had taken a single blanket and covered both of them with it, and the blanket had been placed up to her shoulders, concealing his activities from other persons in the airplane cabin. She also noticed that Jahagirdar had placed his fold-down tray in the down position.

Victim D.S. immediately removed Jahagirdar's hand from her vagina, asked him what he was doing, and demanded that he let her out of her seat. She grabbed her pocketbook and rushed to the galley which was several rows behind her seat.

Victim D.S. immediately disclosed to Flight Attendant Pace that she had been sexually assaulted by Jahagirdar. Ms. Pace, recognizing that Victim D.S. was also extremely upset, notified the captain and the "on board leader," Flight Attendant Kelley Horn. Flight attendants also notified four Special Agents from the United States Secret Service who were on board the airplane of the incident.

Victim D.S. was reassigned a seat at the back of the aircraft for her security, and attended to by Ms. Pace. The captain of the airplane initially instructed law enforcement officers to place Jahagirdar in custody. However, agents, concerned that passengers might panic if Jahagirdar put up a struggle while they were placing him in custody, decided to keep him under observation to insure that he did not approach or assault Victim D.S. At the time, Jahagirdar was in his seat feigning to sleep. The flight crew immediately notified the Massachusetts State Police stationed at Logan Airport of the assault, and requested that Jahagirdar be placed into custody when they arrived at Logan.

As the airplane approached Logan, agents became concerned that Jahagirdar may attempt to flee before he was placed into police custody. As a result, agents positioned themselves so that one agent would depart the aircraft before Jahagirdar to alert uniformed officers of his identity, while another agent placed himself near Jahagirdar as he walked off of the aircraft.

Once the airplane landed at Logan Airport, a Secret Service Agent followed Jahagirdar off of the airplane. When Jahagirdar was on the jetway, the agent requested that Jahagirdar step to the side of the jetway for questioning by law enforcement officers. Jahagirdar initially ignored the request. The agent then grabbed Jahagirdar's shoulder bag, repeated the request, and Jahagirdar complied. They were met by a Massachusetts State trooper on the jetway, who, with other troopers, detained Jahagirdar while the victim was questioned.

Victim D.S. remained on the airplane after all other passengers had disembarked. She was initially interviewed by Massachusetts State Trooper Kevin Hogaboom while on the airplane and again in a room in the airport. She was very distraught and told him how Jahagirdar had placed his hand on and in her vagina while she was sleeping on the airplane.

After speaking with Victim D.S., State Troopers placed Jahagirdar under arrest and took him to the State Police Station at Logan. A State Police laboratory chemist, Carol Courtwright, was called just before 7:00 p.m. and arrived at the airport at approximately 9:30 p.m. Officers first sought consent from the defendant to swab his hands and scrape underneath his fingernails. The defendant declined to provide that consent. Thereafter, Ms. Courtwright swabbed the defendant's hands using distilled water and an oversized cotton swab.[2] Ms. Courtwright then used a small wooden stick to obtain material underneath the defendant's fingernails, in the same manner as one would clean underneath one's nails. No nail or skin was cut; simply the material from beneath the nails was obtained.

Jahagirdar was charged in East Boston District Court with rape in violation of M.G.L.c. 265 §22(b), assault with intent to rape in violation of M.G.L.c. 265 §24, and threatening to interfere with the operation of an aircraft in violation of M.G.L.c. 90 §40. Jahagirdar was subsequently indicted by a Suffolk grand jury for violations of M.G.L.c. 265 §§22(b) and 24. These state charges were dismissed when the case was adopted for federal prosecution and he was indicted on February 11, 2004, for violations of 49 U.S.C. §46506 and 18 U.S.C. §§2242(a) and 2244(a)(2).

**Argument**

The defendant seeks the suppression of hand swabbings and fingernail scrapings taken from him after his arrest at Logan Airport. He claims that officers did not have probable cause to arrest him upon his arrival at the airport, and that even if there was probable cause, officers should have obtained a search warrant to obtain the samples. This Court should reject the

---

[2] The swab had the appearance of a large "Q-Tip" swab.

defendant's argument because State Troopers had probable cause to arrest the defendant for threatening to interfere with the operation of an aircraft in violation of M.G.L.c. 90 §40. Moreover, officers had probable cause to believe that the defendant had committed a felonious sexual assault aboard the aircraft, and had authority to arrest him for that conduct. Finally, the warrantless swabbing of the defendant's hands, and scraping underneath his fingernails, was not unreasonable and therefore did not violate the Fourth Amendment. The search and seizure of the material on his hands and underneath his fingernails were conducted as a search incident to a lawful arrest. Moreover, the defendant has no expectation of privacy in the material on the surface of his hands, and the scraping of his nails in the absence of a warrant was necessary and reasonable in light of the need to capture the evidence before it was further damaged or destroyed.

**I.     State Troopers had probable cause to arrest Jahagirdar for threatening to interfere with the operation of an aircraft in violation of M.G.L.c. 90 §40.**

After speaking with the flight crew and Secret Service Agents, and interviewing Victim D.S. herself, State Troopers had probable cause to conclude that the defendant had digitally raped Victim D.S. aboard the aircraft and, in the course of doing so, had threatened to interfere with the operation of the aircraft.

M.G.L.c. 90 §40, reads in pertinent part:

> The pilot in command of any aircraft carrying passengers for hire may take such action as is reasonably necessary to restrain any person who interferes with, or threatens to interfere with, the operation of the aircraft.
> The person so restrained may be placed in charge of a police officer in the city or town where the aircraft next lands within the commonwealth, to be taken to a lawful place of detention. Complaint shall be made against the person arrested, by the officer taking him to the place of detention, to a district court having jurisdiction over such offenses committed in the city or town where such person is detained, and such court shall have jurisdiction of the case.

The penalties for interfering and threatening to interfere with the operation of an aircraft, are "a fine of not less than ten nor more than five hundred dollars, or by imprisonment for not less than one month nor more than six months, or both." See M.G.L.c. 90 §44.

As a general matter, probable cause means only "reasonable grounds to believe" (or "reasonable cause"). United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979). For probable cause to be present it is not necessary that it is "more likely than not" that a crime has been committed, or that there be "proof by a preponderance of the evidence" or even a "prima facie showing" of criminality. Id.; see also Illinois v. Gates, 462 U.S. 213, 235 (1983)("only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause"). "The indicia of guilt [required for probable cause] need not be absolute, or even fully consistent; they may leave some room for doubt, and even error." Pendergrast v. United States, 416 F.2d 776, 784 (D.C. Cir. 1969) citing Brinegar v. United States, 338 U.S. 160, 172-173, 176 (1949).

Officers had probable cause to conclude that the defendant threatened to interfere with the operation of the aircraft through the disturbance he caused by committing a sexual assault in mid-flight. The flight crew responded immediately by moving Victim D.S. to a safe location at the rear of the craft, alerting the captain of the craft, and requesting the assistance of law enforcement officers who were onboard the aircraft. A flight crew member sat with Victim D.S. to help calm her after the assault, and to ensure that the defendant did not approach her. While serious consideration was given to restraining the defendant in mid-flight to protect Victim D.S. and other passengers, the captain and law enforcement officers determined that such an effort might cause a panic aboard the flight, and further interfere with the operation of

the flight. However, the captain did contact State Troopers at Logan to notify them of the threat and to recommend the defendant's arrest upon arrival.

In addition, in order to deal with the threat the defendant posed, agents seated themselves around him, kept him in their observation and were prepared to restrict his movement about the aircraft. The flight crew and agents had cause to believe that Jahagirdar's unusual and risky assaultive behavior aboard the flight was reflective of an inability to control his conduct or may have been some type of mental instability. They also had reason to believe that the defendant could become volatile or abusive if he came into contact with the victim or if he confronted a flight attendant about Victim D.S.'s report. The fact that agents kept Jahagirdar under observation is reflective of the threat he posed to the operation of the aircraft; had there been no concern that he posed a threat, there would have been no need to do so, since he had no way of escaping in mid-flight.

While there is a paucity of cases interpreting M.G.L.c. 90 §40, cases interpreting related federal and state aircraft interference statutes support the conclusion that there was probable cause to conclude that the defendant threatened to interfere with the operation of the aircraft. Under a similar federal statute which prohibited interference with flight crews, 49 U.S.C. § 46504, it is not necessary that the aircraft to be endangered for the crime to be committed. See United States v. Tabacca, 924 F.2d 906, 911 (9th Cir. 1991)(decided under a predecessor statute, 49 U.S.C. §1472(j)). Similarly, in a state misdemeanor prosecution for threatening to interfere with an aircraft, the Virginia Court of Appeals concluded that, "[a] finding of interference . . . does not also require a finding that someone was placed in danger." Johnson v. Commonwealth, 37 Va.App. 634, 644 (2002). In the absence of other sources, the Johnson court went on to rely

on more traditional definitions of "interfere" which included to ". . . hinder; infringe . . .[or] disturb" the operation of the aircraft. Id.  It is also notable that the parallel federal statute is written in a more specific manner, so as to mean "either an interference with the flight crew's duties or ***a lessening of the flight crew's ability to perform his or her duties***."  See 49 U.S.C. § 46504; United States v. Flores, 968 F.2d 1366, 1369-1370 (1st Cir. 1992)(emphasis added).  Here, the operation of the flight was disturbed, and the flight crew, including the captain, were required to respond to the incident, lessening their ability to perform their ordinary tasks of attending to the care of the passengers and operating the aircraft.  See gen. United States v. Hall, 691 F.2d 48, 50 (1st Cir. 1982)(interference with flight crew included threat posed by volatile passenger even while passenger sat calmly in seat).  As a result, State Troopers had probable cause to believe that the defendant had violated M.G.L.c. 90 §40, by threatening to interfere with the operation of the aircraft, and had authority under that statute to arrest and detain him.

II. **State Troopers were otherwise authorized to arrest Jahagirdar because there was probable cause to conclude that he had committed a felonious sexual assault aboard the aircraft.**

Even if this Court were to determine that there was insufficient probable cause to conclude that the defendant violated M.G.L.c. 90 §40, Troopers had probable cause to believe that the defendant had digitally raped Victim D.S. aboard the flight while she was asleep, and had authority to arrest him for that felonious conduct.  Digital rape aboard a commercial aircraft of the United States constitutes a violation of 49 U.S.C. § 46506 and 18 U.S.C. § 2242, a federal felony punishable by up to 20 years in prison.

The pertinent statutes read in part:

An individual on an aircraft in the special aircraft jurisdiction of the United States[3] who commits an act that--
(1) if committed in the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18) would violate . . . chapter 109A of title 18 [which includes section 2242], shall be fined under title 18, imprisoned under that section or chapter, or both.

See 49 U.S.C. § 46506.

Section 2242 of 18 United States Code reads in pertinent part:

Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, knowingly--
(1) causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping); or
(2) engages in a sexual act with another person if that other person is--
(A) incapable of appraising the nature of the conduct; or

---

[3] The special aircraft jurisdiction of the United States is defined at 49 U.S.C. § 46501(2):

"special aircraft jurisdiction of the United States" includes any of the following aircraft in flight:
(A) a civil aircraft of the United States.
(B) an aircraft of the armed forces of the United States.
(C) another aircraft in the United States.
(D) another aircraft outside the United States--
(i) that has its next scheduled destination or last place of departure in the United States, if the aircraft next lands in the United States;
(ii) on which an individual commits an offense (as defined in the Convention for the Suppression of Unlawful Seizure of Aircraft) if the aircraft lands in the United States with the individual still on the aircraft; or
(iii) against which an individual commits an offense (as defined in subsection (d) or (e) of article I, section I of the Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation) if the aircraft lands in the United States with the individual still on the aircraft.
(E) any other aircraft leased without crew to a lessee whose principal place of business is in the United States or, if the lessee does not have a principal place of business, whose permanent residence is in the United States.

> (B) physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act;
> or attempts to do so, shall be fined under this title, imprisoned not more than 20 years, or both.

A "sexual act" is defined at 18 U.S.C. § 2246(2) as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, slight;
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

In this case the Troopers had probable cause to believe that the defendant had committed a violation of 18 U.S.C. § 2242(2), by committing the "sexual act" of penetrating Victim D.S.'s vagina with his hand with the intent to gratify his sexual desire. Since Victim D.S. was asleep at the time the defendant commenced his assault of her, she was both "incapable of appraising the nature of the conduct," and "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act." See e.g. United States v. Barberg, 311 F.3d 862, 863 (7th Cir. 2002)(victim asleep on airplane when sexually assaulted by defendant); United States v. Barrett, 937 F.2d 1346, 1348 (8th Cir. 1991)(victim consumed 8 cans of beer, a marijuana cigarette, and was sleeping at time of assault); United States v. Peters, 277 F3d 963, 968 (7th Cir 2002)(citing Barrett for proposition that sleep alone is sufficient to find element met); United States v. Williams, 89 F.3d 165, 168 (4th Cir. 1994)(noting that if victim drunk or asleep it would meet this element of the offense).

State Troopers are authorized under Massachusetts common law to arrest an individual

for the commission of a felony, even when that felony did not occur in their presence. See United States v. Watson, 423 U.S. 411, 416-422 (1976) ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest."); Rohan v. Sawin, 59 Mass. 281, 284 (1850)("Peace-officers without warrant may arrest suspected felons."); M.G.L.c. 22C §12 (Massachusetts State Troopers have "common law authority as peace officers"); see also, Commonwealth v. Savage, 430 Mass. 341, 346 (1999)("We have recognized that an arrest for the commission of a felony outside an officer's jurisdiction can be a lawful citizen's arrest").

While the Troopers initially believed that their authority to arrest the defendant stemmed from violations of the state rape statutes (and an interference with the fight) with which he was initially charged[4], rather than a federal sexual assault charge, so long as the arrest was supported by probable cause of a violation of any felony, the officers' intent at the time of the arrest is immaterial. See United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003)("That the police arrested the appellant for receiving stolen goods rather than for an attempted credit card fraud is of no moment. What counts is that probable cause existed, whether for the charge actually prosecuted or for some other offense that justified full custodial detention."); United States v. Bizier, 111 F.3d 214, 218 (1st Cir. 1997) ("The probable cause justifying a lawful

---

[4] Troopers' reasonable belief that the defendant's sexual assault of Victim D.S. was a state crime was subsequently supported by the issuance of a criminal complaint by the East Boston District Court on the same charges, and the indictment by a Suffolk County grand jury on those same charges. Trooper Hogaboom would also testify that while he charged the defendant with state crimes, he also understood that the conduct constituted a federal offense.

custodial arrest, and therefore a search incident to that arrest, need not be for the charge eventually prosecuted."); United States v. Prouse, 945 F.2d 1017, 1023-24 (8th Cir. 1991)("Where a defendant is arrested for the wrong offense, the arrest is still valid if probable cause existed to arrest the defendant for a closely related offense."); United States v. Rambo, 789 F.2d 1289, 1294 (8th Cir.1986)(same); Gasho v. United States, 39 F.3d 1420, 1428 (9th Cir. 1994)("Probable cause may still exist for a closely related offense, even if that offense was not invoked by the arresting officer, as long as it involves the same conduct for which the suspect was arrested. . . It is immaterial that the officer did not have in mind the specific charge upon which the arrest can be justified.")(citation omitted). In this case, the defendant was arrested and charged for the same conduct for which he has been charged federally, and for which there was probable cause to arrest. Therefore, the defendant's argument, that there was no basis for charging the defendant with rape under state law, is inapposite.

In an analogous case, the Eight Circuit in United States v. Prouse upheld the warrantless taking of blood alcohol samples of two pilots whom an FAA aviation inspector had probable cause to believe had been operating an aircraft under the influence of alcohol. Prouse, 945 F.2d at 1023-25. At the time the inspector arrested the pilots and required the tests, he did so on a suspected infraction of the federal aviation regulations prohibiting flight under the influence of alcohol. Id. The inspector had no authority to arrest under those regulations because they were civil violations. Id. The inspector was unaware that it was a federal felony to fly a plane under the influence and did not rely on that authority at the time of the arrest. Id. The Eight Circuit upheld the arrest and the use of the blood tests in a subsequent criminal prosecution, noting that it was immaterial that the inspector was not aware that there was probable cause to conclude that

a federal felony had been committed. Id. The fact that such probable cause existed was sufficient to conclude that the arrest was lawful and that the blood tests were part of a valid search incident to the arrest. Id. Thus, in this case, it is not material that the State Troopers arrested the defendant without specific knowledge of the federal law violated by the defendant's conduct.

**III.    The swabing of the defendant's hands, and scraping underneath his fingernails were part of a valid search incident to an arrest and were otherwise reasonable, given the limited intrusion of those procedures and the evanescent nature of the evidence.**

The swabbing of the defendant's hands, and the scraping beneath his fingernails, were conducted after a full custodial arrest and officers were not required to seek a search warrant to obtain such evidence. As the First Circuit has noted, "it is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant." United States v. Winchenbach, 197 F.3d 548, 552 (1st Cir. 1999). Moreover, a search incident to arrest need not be supported by a search warrant or exigent circumstances to be deemed a reasonable search under the Fourth Amendment. See United States v. Robinson, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."); Chimel v. California, 395 U.S. 752, 762-763 (1969) ("it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or

destruction").

While warrantless searches incident to arrest must still be deemed reasonable to pass constitutional muster, as in the case of strip searches and body cavity searches incident to arrest, see, e.g. Swain v. Spinney, 117 F.3d 1, 6 (1st Cir. 1997), the search in this case was reasonable in that it was brief, minimally intrusive, and designed to obtain critical "highly evanescent evidence." See Cupp v. Murphy, 412 U.S. 291, 295 (1973)(concluding that scraping underneath fingernails was reasonable even though not part of a search incident to arrest because of nature of evidence beneath nails and ease of its destruction). With respect to the swabbing of the defendant's hands, there is serious doubt as to whether he has a reasonable expectation of privacy in the surface of his hands that is constitutionally cognizable. Such swabbing is even less intrusive than fingerprinting, which has been routinely held to be a permissible procedure upon arrest. See, e.g. United States v. Bridges, 499 F.2d 179, 184 (7th Cir. 1974)(hand swabbings were "no more offensive to [defendant's] person than fingerprinting or photographing"). The swabbing of the defendant's hands is of a similar character as fingerprinting, voice exemplars, handwriting exemplars, hair cuttings, and foot prints, for which courts have concluded there is no reasonable expectation of privacy. Id.; Davis v. Mississippi, 394 U.S. 721, 727 (1969)(fingerprinting in controlled circumstances does not raise Fourth Amendment concerns); United States v. Dionisio, 410 U.S. 1, 14 (1973)(voice exemplars sought by grand jury not raise Fourth Amendment concerns); United States v. Mara, 410 U.S. 19, 21 (1973)(handwriting exemplars not raise Fourth Amendment concerns because there is, "no more expectation of privacy in the physical characteristics of a person's script than there is in the tone of his voice"); United States v. D'Amico, 408 F.2d 331, 333 (2nd Cir.

1969)(admission into evidence of clippings of defendant's hair did not violate his Fourth Amendment right.); In re Grand Jury Proceedings (Mills), 686 F.2d 135, 139 (3rd Cir. 1982)(upholding the warrantless seizure of head hair, analogizing to public nature of fingerprints); United States v. Ferri, 778 F.2d 985, 995-996 (3rd Cir. 1985)(no expectation of privacy in footprint and shoeprint). Moreover, even if the defendant had some limited expectation of privacy in the material on the surface of his hands, the swabbing of them with water was reasonable in light of the probable cause to believe he had digitally raped a young woman, and the need to preserve the evidence before it was washed or wiped off by the defendant. See United States v. Love, 482 F.2d 213, 216-217 (5th Cir. 1973)(upholding swabbing of defendant's hands as lawful search incident to arrest).

While the scrapping underneath the defendant's fingernails involves a constitutionally protected interest, the procedure in this case was reasonable given the brief and minimally intrusive nature of it and the risk that the evidence contained under his nails could be destroyed or lost. See Cupp v. Murphy, 412 U.S. at 295 (holding scraping of subject's fingernails was reasonable, even though he was not under arrest, because of the need, "to preserve the highly evanescent evidence they found under his fingernails."); Brent v. White, 398 F.2d 503, 505 (5th Cir. 1968)(upholding scraping of defendant's penis for vaginal fluids, concluding that, " the scraping constituted a permissible search of the person incident to a lawful arrest and involved no intrusion of the body surface. Additionally, there was threat of imminent destruction of the evidence of menstrual blood."); Taylor v. Riddle, 563 F.2d 133, 135 (4th Cir. 1977)(permissible for law enforcement officer seeing blood under fingernails to take scraping in the absence of a

warrant).[5]  Thus, the evidence seized from the defendant's hands should not be suppressed because it was obtained incident to a lawful arrest and was otherwise reasonable in light of the nature of the evidence and the minimal intrusion necessary to obtain the evidence.

### Conclusion

For the reasons set forth above, the government respectfully requests that the defendant's motion to suppress evidence be denied.

                                                Respectfully submitted,

                                                MICHAEL J. SULLIVAN
                                                United States Attorney

Date: June 25, 2004                      By: /s/ John T. McNeil
                                                JOHN T. MCNEIL
                                                Assistant U.S. Attorney

---

[5]  While the government need not establish that there were exigent circumstances justifying the warrantless search in this case, as claimed by the defendant, this Court could conclude that such circumstances existed.  The defendant had been taken into custody for digital rape.  Critical evidence was present on at least one of his hands in the form of Victim D.S.'s DNA.  The defendant had an extraordinary incentive to destroy the evidence, particularly once his consent had been requested and refused.  A number of courts have recognized that in just such circumstances, it is critical that the evidence be obtained in an expeditious manner. See, e.g. Cupp v. Murphy, 412 U.S. at 295; United States v. Bridges, 499 F.2d at 184; United States v. Love, 482 F.2d at 216-217.

## **CERTIFICATE OF SERVICE**

      I hereby certify that I served a copy of the foregoing pleading on counsel for the defendant, James W. Lawson, Esq., by mailing a copy to him by first class mail to Oteri & Lawson, PC, 20 Park Plaza, Suite 905, Boston, MA 02116 on June 25, 2004.

                                        <u>/s/ John T. McNeil</u>
                                        John T. McNeil
                                        Assistant U.S. Attorney