UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** ) | | |
| ) | | |
| v. ) | **CRIMINAL NO. 04-10038-MLW** | |
| ) | | |
| **DEEPAK JAHAGIRDAR** ) | | |
| ) | | |

**Government's Memorandum Regarding Admissibility of D.S.'s Statements
and Opposition to Defendant's Motion *in Limine*
to Exclude Statements of D.S. to Massachusetts State Troopers**

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully submits this memorandum outlining the admissibility of post-assault statements of Victim D.S. This memorandum also serves as an opposition to Defendant's Motion to Exclude Statements of D.S. (Docket No.51).

In sum, the statements made by Victim D.S. to two flight attendants immediately after her assault are admissible as excited utterances under Fed.R.Evid. 803(2). Portions of those statements are also admissible pursuant to Rule 803(1) as statements describing an event immediately after that event.

Contrary to the defendant's assertion, the statements Victim D.S. made to state troopers immediately upon arrival in Boston are also admissible. As outlined below, those statements are likely to be admissible as prior consistent statements offered to rebut an implied charge of recent fabrication, under Fed.R.Evid. 801(d)(1)(B). The government also requests that the Court reserve judgment on determining whether the statements are admissible under Rule 803(2) (excited utterances), until after the Court has heard the testimony of Victim D.S. and her

1

susceptibility to the stressors which were present between the time of the assault and her interview by state troopers.

The government also anticipates that the defendant will seek to cross-examine Victim D.S. regarding statements she made to the medical staff at the Beverly Hospital. She was sent to a medical facility by the state police at Logan Airport in order to have a rape kit[1] completed. The government anticipates that, at a minimum, the Court will permit cross-examination on this subject, if not admit the records from that examination as well.

As set forth below, the admission of the flight attendant's statements pursuant to Rule 803(2), combined with the admission of statements given to medical personnel under Rule 803(4), without the admission of Victim D.S.'s statements to the troopers when first interviewed by them, will encourage the jury to draw a factually incorrect inference regarding when Victim D.S. first reported that the defendant's hand penetrated her vagina during the assault. The Court should permit the government to address this incorrect inference by admitting the Trooper's testimony pursuant to Rule 801(d)(1)(B).

---

[1] A rape kit is a standardized evidence collection package which is completed by medical personnel when treating a victim of an alleged rape. See, e.g. United States v. Boyles, 57 F.3d 535, 538 (7th Cir. 1995). The package contains a number of forms to be completed by medical personnel regarding the nature of the assault and the evidence of the assault found on the victim. The package also directs the medical personnel to collect the victim's clothing, and to take biological samples from various locations on the victim's body. The rape kit is completed while law enforcement authorities are waiting, and the completed rape kit is then turned over to law enforcement authorities as evidence. In this case, the forms were completed, and Victim D.S.'s clothing was collected. However, because the assault was a digital one, and no injuries were reported, there were no other samples taken. The rape kit was turned over to Massachusetts State Trooper Daniel Sullivan, who had accompanied the victim and her parents to the hospital.

The government anticipates that Victim D.S. will testify in detail regarding the defendant's sexual assault of her while she was sleeping aboard Delta Flight 2100 on March 31, 2002. Among other things, the government expects Victim D.S. to testify that the defendant put his hands down the front of her pants, under her underwear, and grabbed her vagina. She will also testify that she believes that his hand penetrated her vagina during the assault.[2] The government anticipates that the defendant will challenge Victim D.S.'s testimony, and in particular, call into question Victim D.S.'s testimony that the defendant penetrated her vagina with his hand.[3]

### Victim D.S.'s Statements to Flight Attendants

With respect to the statements Victim D.S. made to other persons after the assault, the government anticipates that Victim D.S. will testify that moments after she was assaulted by the defendant in her seat, she fled towards the rear of the aircraft. She first encountered Flight Attendant Gwen Pace. She explained to Ms. Pace that she had been sleeping aboard the aircraft and the man seated next to her had put his hand down the front of her pants. Both Ms. Pace and Victim D.S. will testify that Victim D.S. was visibly upset at the time of this statement. Ms.

---

[2] As noted below, the first time Victim D.S. was asked about whether she was penetrated by the defendant's hand – by Trooper Hogaboom shortly after the flight landed at Boston Logan – Victim D.S. answered affirmatively. In addition, Victim D.S. twice testified in the state grand jury that her vagina was penetrated, and has consistently indicated so in all interviews with law enforcement personnel.

[3] As noted in the Government's Trial Memorandum, to find the defendant guilty of Count 1 of the Indictment, the jury must conclude that the defendant, "engaged in, or attempted to engage in, the penetration, however slight, of the genital opening of another person by a hand or by a finger." See 18 U.S.C. § 2244(a)(2).

Pace immediately took Victim D.S. into the galley at the rear of the aircraft, drew the curtain, and called for the assistance of the onboard flight leader, Kelly Horn.

It is anticipated that Ms. Horn will testify that she immediately responded to find Victim D.S. and Ms. Pace in the galley, and that Victim D.S. was visibly upset while recounting the assault which had just occurred. It is anticipated that Ms. Horn will testify that Victim D.S. explained that the man's touching her could not have been a mistake, because "he was under her underwear, and was all the way 'down there'." Neither flight attendant asked for greater detail regarding the assault, and did not ask about, or otherwise mention, the concept of "penetration."

The defendant has not sought to exclude this testimony *in limine*, as he is now seeking to exclude the statements Victim D.S. made to the state troopers upon landing at Boston Logan. As noted above, Victim D.S.'s statements to the flight attendants are typical of those admitted as excited utterances under Fed.R.Evid. 803(2), as they were made moments after the assault, moments after Victim D.S. had been woken from a deep sleep, and Victim D.S. was visibly upset at the time of the statements. Moreover, the statements were directly related to the startling event or condition. See United States v. Collins, 60 F.3d 4, 8 (1st Cir.1995)(excited utterance when three elements are present: (1) the declarant experiences a startling event or condition, (2) she makes a statement while still subject to the influence of the event, and (3) the statement is related to the event); United States v. Bailey, 834 F.2d 218, 227-28 (1st Cir.1987); Fed.R.Evid. 803 Advisory Committee Note (reasoning behind the excited utterance exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication."). These statements are also arguably admissible pursuant to Rule 803(1) as statements describing an event immediately after

that event. See, e.g. United States v. Kehoe, 562 F.2d 65, 70 (1st Cir. 1977)(notes made shortly after observations admitted as present sense impressions).

**Statements to State Troopers**

Upon arrival at Boston Logan International Airport, uniformed Massachusetts State Troopers met the aircraft at the jetway and detained the defendant as he got off of the flight. As soon as all of the passengers had been taken off the aircraft, with the exception of Victim D.S., who had been asked by the flight crew to stay behind, uniformed troopers interviewed Victim D.S.

Trooper Hogaboom, who had training and experience in investigating sexual assaults questioned Victim D.S. She was visibly upset at the outset of the interview, and immediately reported to him that while she had been sleeping a man hand put his hands down her pants, and under her underwear. Hogaboom explained to Victim D.S. that he needed as much detail as possible about whether and how the defendant had touched her, and asked her if the defendant's hand had penetrated her vagina. While Victim D.S. was made extraordinarily uncomfortable by this question, she nonetheless responded that his hand had penetrated her vagina. Hogaboom then noted to his partner, Trooper Sullivan, and Victim D.S., that this was a rape case rather than a simple sexual assault case. At this Victim D.S. burst into tears. She will testify, if permitted, that hearing the word "rape" made her realize the seriousness of the conduct and "how badly she had been violated." Throughout the interview, Victim D.S. was extraordinarily uncomfortable with talking about the details of the sexual assault, her own anatomy, and in particular with describing how the defendant had put his hand inside of her vagina.

Victim D.S. will also testify that prior to Hogaboom's question, she placed no significance on whether the defendant "penetrated" her or not. She will also testify that she had not been asked the question by any person before Hogaboom asked it. Hogaboom and Sullivan will testify that Hogaboom did not lead Victim D.S. or explain to her the legal significance of penetration before he asked her the question. Hogaboom will testify that his training and practice in interviewing sexual assault victims was not to suggest any answer to the victim, and not to inform the victim of the legal significance of any particular fact before the victim was asked in detail about the assault.

As noted above, Victim D.S.'s statements to Troopers Hogaboom and Sullivan are most likely to be admissible as non-hearsay pursuant to Fed.R.Evid. 801(d)(1)(B).[4] Notably, the defendant's motion *in limine* does not assert that this is an improper ground for admissibility. While this basis for admitting testimony is premised on the defendant's "express or implied" claim that Victim D.S. is fabricating her testimony regarding whether the defendant penetrated her vagina, it is difficult to imagine a scenario in which the defendant does not call into question that testimony either through argument or cross-examination. See United States v. Lozada-Rivera, 177 F.3d 98, 104 (1st Cir. 1999)(" a charge of improper motive or recent fabrication need not be expressly made or buttressed by concrete evidence"); United States v. Young, 105 F.3d 1,

---

[4] Fed.R.Evid. 801(d) provides in pertinent part:

(d) Statements which are not hearsay. A statement is not hearsay if--
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ...
(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . .

9 (1st Cir. 1997)(recognizing that jury could infer defense assertion of recent fabrication from general questioning by the defendant on subject) . In fact, it appears, given that the defendant is seeking to exclude the troopers' testimony while not seeking to exclude the flight attendants' testimony, that he intends to argue that the jury should give credit to her more limited statements to the flight attendants, but disregard Victim D.S.'s trial testimony regarding penetration.

Fed.R.Evid. 801(d)(1)(B) sets forth a three-part test for determining whether a prior statement qualifies as non-hearsay for purpose of rebutting an inference of recent fabrication: 1) the declarant testifies at trial and is subject to cross-examination; 2) the challenged statements and the declarant's trial testimony are consistent; and 3) the challenged statements are offered to rebut the express or implied charge that the declarant recently fabricated her story or became subject to some improper influence or motive to falsify after making the challenged statement. See United States v. Alzanki, 54 F.3d 994, 1008 (1st Cir. 1995) ; Tome v. United States, 513 U.S. 150 (1995); United States v. Vest, 842 F.2d 1319, 1330 (1st Cir. 1988).

Assuming that the defendant calls into question the reliability of her testimony that he penetrated her vagina with his hand, Victim D.S.'s testimony regarding what she told Troopers Hogaboom and Sullivan, and the troopers' testimony regarding those statements, are properly admitted to rebut an inference of recent fabrication. See United States v. Barrett, 937 F.2d 1346, 1348-49 (sexual assault victim's statements to law enforcement officers regarding the nature of the assault before officers explained nature of possible charges admissible under Rule 801(d)(1)(B)). At the time Victim D.S. told the officers that she had been penetrated by his hand, she had not been alerted to the legal significance of that fact, and was not otherwise knowledgeable of whether someone putting his hand down her pants was any more or less

significant than penetrating her vagina with his hand. Id. Given that she had no reason to tell this particular fact to the flight attendants, and her general reluctance and embarrassment to describe the details of how a stranger touched her genitals, it was completely understandable that the officers were the first persons to whom this young woman told this fact. Moreover, she only revealed the fact of his penetration upon a specific non-suggestive inquiry by Trooper Hogaboom. If she had developed a motive to fabricate this aspect of the assault during the remainder of her flight to Boston, she would have volunteered it immediately upon questioning by the troopers. Instead, Trooper Hogaboom had to elicit it with requests for more specific detail and with a specific question.

Since no motive to fabricate arose in the time between the assault and her statements to the Troopers, the Court should admit her statements, and the Troopers' statements pursuant to Rule 801(d)(1)(B). Id.; see also Alzanki, 54 F.3d at 1008 (admitting victim's prior consistent statements to nurses, therapist, and police officer describing how the defendants inhumanely held her in involuntary servitude before she was approached with offers from Hollywood producers to purchase film rights to her story and from newspapers to publicize her story); Arizona v. Johnson, 351 F.3d 988, 999 (9th Cir. 2003)(admitting alien's statements to Border Patrol agents describing sexual assault before any offer was made to allow her to remain in the United States during the investigation and trial). [5]

---

[5] The government respectfully reserves its right to argue that Victim D.S.'s statements to the troopers may qualify as excited utterances under Rule 803(2). While more than an hour passed between the assault and her statements to the Troopers, Victim D.S. was in a particularly weakened state because she had been awake all night long, and the stress of the assault kept her awake for the remainder of the flight; she was also forced to be confined in the aircraft with the defendant for that period, although she was assigned another seat. Moreover, the release of the defendant from the aircraft, the arrival of uniformed troopers on the aircraft, and the difficult

**Statements to Medical Personnel**

Troopers directed Victim D.S.'s parents, who had been waiting for her arrival at the airport, to take her to a nearby hospital for the completion of a rape kit. Trooper Sullivan accompanied them in a separate vehicle. Victim D.S. will testify that she did not want to go to the hospital because she did not need to be treated, but she understood she had to go to the hospital to have evidence collected from her. She has indicated that the hospital visit was "a blur" and that at that point she was exhausted from lack of sleep the night before, and the events on the airplane. She does not recall making specific statements regarding her assault to medical personnel.

The medical record reveals that Victim D.S. was treated by Nurse Samantha McHale and Dr. Eugene Ostroff. Nurse McHale reported that the patient said that a man had put his hand down her pants while she was sleeping on the flight. She subsequently filled out two related forms in which one noted that there was penetration, however slight, of the vagina by the finger. Another nearly identical form was filled out by the nurse indicating that there was an attempt to penetrate the vagina with a finger.[6]

---

detailed and intimate questioning of Victim D.S. was sufficient to carry the shock of the initial assault over to the statements she made to the troopers. See, e.g. United States v. Cruz, 156 F.3d 22, 30 (1st Cir. 1998)(admitting statement by battery victim, who could not escape the apartment where the beating occurred for some time after, to women's shelter employee four hours after the beating as an excited utterance); United States v. Akins, 1998 WL 380509, *2 (10th Cir. 1998)(admitting statements by adult declarant to police officers, who described her as appearing shaken and almost crying, up to an hour after being threatened at gunpoint)(unpublished). While the government recognizes that finding an excited utterance more than an hour after the event would be unusual, the Court should have the benefit of observing the victim's trial testimony before reaching such a conclusion.

[6] If called to testify Nurse McHale would testify that she has no current recollection of what Victim D.S. stated to her regarding penetration.

The doctor's notes reveal that the patient reported that she awoke to find a man's hand down her pants, and that he was "grabbing her vagina." The doctor's typewritten notes reveal in pertinent part that "a male passenger sitting next to her placed his hands down her pants and grabbed her vagina, this while she was asleep on her seat. The patient awoke when he grabbed her. She states that she does not believe his finger penetrated her."

The government recognizes that this is a proper subject for the defendant's cross-examination. The government outlines this information for the Court because in the absence of admitting evidence of Victim D.S.'s statements to the Troopers, the defendant will be able to unfairly argue, or the jury may draw the mistaken inference, that the first time Victim D.S. informed anyone of the penetration, was some time long after the event occurred. Without hearing from Troopers Hogaboom and/or Sullivan regarding Victim D.S.'s statements, the jury is likely to incorrectly infer – from the limited flight attendant testimony, and cross-examination on the medical records – that her direct testimony regarding penetration is recently fabricated. Such a piecemeal application of the Federal Rules of Evidence in this particular case – permitting the flight attendant statements under Rule 803(2) and the medical record testimony under Rule 803(4) – would lead the jury to draw an inference which is directly contrary to compelling evidence that Victim D.S. provided to the State Troopers.[7]

---

[7] The Federal Rules have not adopted the wisdom of many state courts, which would permit Victim D.S.'s statements to the troopers under the fresh complaint doctrine in sexual assault cases for the very reason that jurors want to know when and how the victim first reports such an assualt. See, e.g. Commonwealth v. Peters, 429 Mass. 22, 27 (1999); see gen. Stanchi, The Paradox of the Fresh Complaint Rule, 37 B.C. L.Rev. 441 (1996).

**Conclusion**

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's motion *in limine* regarding the statements of Troopers Hogaboom and Sullivan, and await the unfolding of the arguments and evidence at trial before making a ruling on the admissibility of these statements.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

Date: March 16, 2005        By: *John T. McNeil*
JOHN T. MCNEIL
Assistant U.S. Attorney