RAPE (G.L. c. 265, § 22)[1]

In this case, the defendant, (defendant/name), is charged with rape.[2] Our state legislature has specifically defined this crime in a statute, G.L. c. 265, § 22, which provides in relevant part:

> Whoever has sexual intercourse or unnatural sexual intercourse with a person, and compels such person to submit by force and against his will, or compels such person to submit by threat of bodily injury . . . shall be punished.[3]

First, I will define rape for you. Rape is natural or unnatural sexual intercourse with another person by force and against that person's will, or that compels such person to submit to such act by threat of bodily force or violence.[4]

In order to prove the defendant guilty of rape, the Commonwealth must prove the following two elements beyond a reasonable doubt:

First Element: the Commonwealth must prove beyond a reasonable doubt that the defendant engaged in sexual intercourse, either natural or unnatural with the complainant; and

Second Element: the Commonwealth must prove beyond a reasonable doubt that the sexual intercourse was accomplished by compelling the complainant to submit by force or threat of bodily injury and against (his/her) will.

The first element the Commonwealth must prove beyond a reasonable doubt is that the defendant engaged in either natural or unnatural sexual intercourse with the complainant. Natural intercourse is normal intercourse—that is, it consists of inserting the penis into the female sex organ.[5] Unnatural sexual intercourse includes oral and anal intercourse, including fellatio and cunnilingus,[6] and other intrusions of a part of a person's body[7] or other object[8] into the genital or anal opening of another's body.[9] Either natural or unnatural sexual intercourse is complete on penetration, no matter how slight, of a person's genital or anal opening.[10] In addition to the vagina, the female genital opening includes the anterior parts known as the vulva and labia. Penetration into the vagina itself is not required.[11]

The second element the Commonwealth must prove beyond a reasonable doubt is that the natural or unnatural sexual intercourse was accomplished by force or

by threat of bodily injury and against the complainant's will.[12] The force needed for rape may, depending on the circumstances, be constructive force,[13] as well as physical force, violence or threat of bodily harm.[14]

The Commonwealth must also prove beyond a reasonable doubt that the defendant performed the sexual intercourse "against the complainant's will." The Commonwealth must prove that at the time of penetration the complainant did not consent, or in other words, that the intercourse was against the complainant's will.[15] If a person submits because of fear it is not consent. The person must be free to exercise (his/her) will without restraint. You may consider evidence of the complainant's state of mind at the time of the alleged incident on the issue of consent.[16]

The complainant is not required to use physical force to resist.[17] However, you may consider evidence of any attempt to restrain or confine the complainant, of violence by the defendant, or of struggle or outcry by the complainant on the issues of force and consent.[18] However, lack of such evidence does not necessarily imply consent or the absence of force, because in certain circumstances physical resistance may not be possible.[19] You may consider all of the circumstances and the entire sequence of events in determining whether the intercourse was without the complainant's consent and (his/her) ability to resist.[20]

[Supplemental Instruction (b)—Complainant Unconscious or in a Stupor]

[Supplemental Instructions (c)—Aggravated Rape]

Therefore, if after considering all of the evidence you determine that the Commonwealth has proven beyond a reasonable doubt each of the two elements I have just defined, that is, that the defendant engaged in either natural or unnatural sexual intercourse with (alleged victim/name), and that the sexual intercourse was accomplished by compelling (alleged victim/name) to submit by force or threat of bodily injury and against (alleged victim/name)'s will, then you shall find the defendant guilty of rape.

If, however, after your consideration of all of the evidence you find that the Commonwealth has not proven either of these two elements beyond a reasonable doubt, you shall find the defendant not guilty of rape.

§ 1.1.1

---

[1] This instruction quotes the chargebook offered as a guide to Superior Court judges in 1995. The notes that follow are from the same source and have been updated for this text.

---

[2] It is no defense to a charge of rape that the complainant is the spouse of the accused. *Commonwealth v. Chretien*, 383 Mass. 123, 127–32, 417 N.E.2d 1203, 1207–09 (1981). While natural sexual intercourse as defined by law may only be accomplished between a male and a female, the law prohibits forcible unnatural intercourse regardless of the sex of either or any of the persons involved. *Commonwealth v. Chretien*, 383 Mass. at 127–32, 417 N.E.2d at 1207–09. In *Commonwealth v. Whitehead*, 379 Mass. 640, 646–50, 400 N.E.2d 821, 828–30 (1980), female defendants were put on notice that forcible female to female intercourse would be prosecuted by the Commonwealth. The Court also noted that accomplices of either sex may be liable as principles in the rape of persons of either sex, and that penetration by an accomplice need not be proven to establish his or her guilt.

In *Commonwealth v. Guy*, 24 Mass.App.Ct. 783, 785–87, 513 N.E.2d 701, 702–04 (1987), the Appeals Court held that where two male defendants forced a female to perform cunnilingus on two other (consenting) females, such sexual act constituted rape of the first female by the defendants within the meaning of G.L. c. 265, § 22(a). See *Commonwealth v. Nuby*, 32 Mass.App.Ct. 360, 362, 589 N.E.2d 331, 332 (1993) (Defendant guilty of rape by forcing victim to perform oral sex on other nonconsenting party).

[3] G.L. c. 265, § 22(b). General Laws c. 265, § 22(a) provides for punishment for a joint enterprise. Section 22(a) also provides additional penalty for such offense which "results in or committed with acts resulting in serious bodily injury."

[4] The crime of rape is codified at G.L. c. 265, § 22(b). In *Commonwealth v. Gallant*, 373 Mass. 577, 590, 369 N.E.2d 707, 715 (1977), the Supreme Judicial Court held that the term "unnatural sexual intercourse" as used in G.L. c. 265, § 23 is not void for vagueness. See *Commonwealth v. Gonzales*, 5 Mass.App.Ct. 705, 707, 369 N.E.2d 1038, 1039 (1977) (words "unnatural sexual intercourse" have the same meaning in both G.L. c. 265, § 22 and G.L. c. 265, § 23).

[5] See *Commonwealth v. Gallant*, 373 Mass. 577, 584, 369 N.E.2d 707, 712 (1977); *Commonwealth v. Cobb*, 26 Mass.App.Ct. 283, 286, 526 N.E.2d 1081, 1084 (1988). Emission of semen, either before, during or after the penetration of the vagina is not necessary. *Commonwealth v. Gallant*, 373 Mass. at 584, 369 N.E.2d at 712; *Commonwealth v. Horn*, 23 Mass.App.Ct. 319, 325, 502 N.E.2d 151, 155, review denied, 399 Mass. 1102, 504 N.E.2d 1066 (1987).

[6] In *Commonwealth v. Edward*, 34 Mass.App.Ct. 521, 523, 613 N.E.2d 115, 117 (1993), the Court instructed that rape could be found if defendant's lips came in contact with the victim's vagina, vulva or labia.

[7] *Commonwealth v. Mamay*, 5 Mass.App.Ct. 708, 369 N.E.2d 1036 (1977) (penetration of victim's genital opening by hand or fingers).

[8] *Commonwealth v. Cifizzari*, 397 Mass. 560, 576–77, 492 N.E.2d 357, 366–67 (1986) (rape by a mop handle); *Commonwealth v. Gallant*, 373 Mass. 577, 584–85, 369 N.E.2d 707, 712–13 (1977).

[9] The term unnatural sexual intercourse is a broad term and encompasses a variety of acts. *Commonwealth v. Nuby*, 32 Mass.App.Ct. 360, 362, 589 N.E.2d 331, 332 (1992). In *Nuby*, the Appeals Court found that the defendant's act of forcing one party to perform oral sex on another party constituted unnatural sexual intercourse. *Commonwealth v. Nuby*, 32 Mass.App.Ct. at 362, 589 N.E.2d at 332. Thus, actual penetration by the defendant is not necessary; the "outrage of compelled sex" marks the offense. *Commonwealth v. Nuby*, 32 Mass.App.Ct. at 362, 589 N.E.2d at 332.

[10] *Commonwealth v. McJunkin*, 11 Mass.App.Ct. 609, 613, 418 N.E.2d 1259, 1262 (1981), review denied, 383 Mass. 891 (1981). It is not necessary to prove that the vagina itself was intruded to constitute rape. It is sufficient if the Commonwealth proves beyond a reasonable doubt that the defendant intruded the vulva or labia of the victim by his penis, some other body part (such as the finger) or another object to constitute the penetration required for rape. *Commonwealth v. Nylander*, 26 Mass.App.Ct. 784, 788, 532 N.E.2d 1223, 1225–28 (1989); *Commonwealth v. Baldwin*, 24 Mass.App.Ct. 200, 204–05, 509 N.E.2d 4, 7, (1987), review denied, 400 Mass. 1102, 509 N.E.2d 1202 (1987). See James L. Rige-Ihaupt, Jr., Annotation, *What Constitutes Penetration in Prosecution for Rape or Statutory Rape*, 76 A.L.R. 3d 163, 178 (1977). It is also sufficient if the Commonwealth proves beyond a reasonable doubt that the defendant intruded the anal opening of the victim by his penis, some other body part or another object. *Commonwealth v. Nylander*, 26 Mass.App.Ct. at 788–92, 532 N.E.2d at 1225–27. See *Commonwealth v. Caracino*, 33 Mass.App.Ct. 787, 792, 605 N.E.2d 859, 862–63 (1993). In *Commonwealth v. Vega*, 36 Mass.App.Ct. 635, 636–37, 634 N.E.2d 149, 150–51 (1994), the victim's testimony that defendant sodomized her was sufficient to infer anal penetration.

[11] *Commonwealth v. Nylander*, 26 Mass.App.Ct. 784, 788, 532 N.E.2d 1223, 1225 (1989).

[12] Rape is not a specific intent crime. *Commonwealth v. Troy*, 405 Mass. 253, 260, 540 N.E.2d 162, 166 (1989); *Commonwealth v. Cordeiro*, 401 Mass. 843, 850–51 n.11, 519 N.E.2d 1328, 1333–34 n.11 (1988); *Commonwealth v. Caldwell*, 397 Mass. 1102, 492 N.E.2d 98 (1986); *Commonwealth v. Grant*, 391 Mass. 645, 649–51, 464 N.E.2d 33, 35–37 (1984); *Commonwealth v. Blair*, 21 Mass.App.Ct. 625, 631, 488 N.E.2d 1200, 1203, review denied, 397 Mass. 1103, 492 N.E.2d 98 (1986); *Commonwealth v. Lefkowitz*, 20 Mass.App.Ct. 513, 518, 481 N.E.2d 227, 230, review denied, 396 Mass. 1103, 485 N.E.2d 188 (1985). "The elements necessary for rape do not require that the defendant intend the intercourse be without consent." *Commonwealth v. Grant*, 391 Mass. at 650, 464 N.E.2d at 37. "The essence of the crime of rape, whether aggravated or unaggravated, is sexual intercourse with another compelled by force and against the victim's will or compelled by threat of bodily injury." *Commonwealth v. Grant*, 391 Mass. at 650, 464 N.E.2d at 36 (citing *Commonwealth v. Sherry*, 386 Mass. 682, 687, 437 N.E.2d 224, 227 (1982)). There is no "special emphasis on the defendant's state of mind." *Commonwealth v. Lefkowitz*, 20 Mass.App.Ct. at 519, 481 N.E.2d at 231, review denied, 396 Mass. 1103, 485 N.E.2d 188 (1985). "The scienter element of the offense thus equates with the scienter sufficient to convict of most crimes, a general intent. That element is not usually explained to the jury in the enumeration of the elements of the crime, being left to be inferred from all the evidence in the case. (See the language in the *Grant* decision 391 Mass. at 651, which speaks in terms of 'the defendant intend[ing] intercourse' as sufficient intent.)" *Commonwealth v. Lefkowitz*, 20 Mass.App.Ct. at 519, 481 N.E.2d at 231 (parenthetical sentence included in original).

Furthermore, a defendant is not entitled to an instruction allowing the jury to consider the effect of intoxication on a defendant's ability to form general intent. *Commonwealth v. Blake*, 409 Mass. 146, 155, 564 N.E.2d 1006, 1012 (1991). See *Commonwealth v. Henson*, 394 Mass. 584, 592, 476 N.E.2d 947, 953 (1985). If the defendant is charged with aggravated rape based on a theory of joint enterprise, the judge still does not need to give the *Henson* instruction. *Commonwealth v. Henson*, 394 Mass. at 592, 476 N.E.2d at 953. Cf. *Commonwealth v. Parker*, 402 Mass. 333, 336–37, 522 N.E.2d 924, 926 (1988) (holding jury must find both defendants shared same intent to constitute joint venture).

As to mistake of fact, Massachusetts law does not recognize a reasonable good faith belief in consent as a defense to rape. *Commonwealth v. Simock*, 31 Mass.App.Ct. 184, 192, 575 N.E.2d 1137, 1142, review denied, 411 Mass. 1102, 579 N.E.2d 1360 (1991). See *Commonwealth v. Ascolillo*, 405 Mass. 456, 463, 541 N.E.2d 570, 575 (1989) (Supreme Judicial Court has never suggested that "in order to establish the crime of rape the Commonwealth must prove in *every case* not only that the defendant intended intercourse, but also that he [or she] did not act pursuant to an honest and reasonable belief that the victim consented") (quoting *Commonwealth v. Grant*, 391 Mass. 645, 651, 464 N.E.2d 33 (1984) (emphasis added)).

[13] Constructive force constitutes threatening words or gestures that operate on the mind. *Commonwealth v. Caracciola*, 409 Mass. 648, 652, 569 N.E.2d 774, 776–77 (1991). In cases where it relies on constructive force, the Commonwealth must also prove that the sexual intercourse was against the will of the victim. *Commonwealth v. Caracciola*, 409 Mass. at 653, 569 N.E.2d at 777. However, fraudulent acts or statements do not constitute force if there are no threats or conduct calculated to install fear in the victim. *Commonwealth v. Caracciola*, 409 Mass. at 653, 569 N.E.2d at 777.

[14] *Commonwealth v. Caracciola*, 409 Mass. 648, 653, 569 N.E.2d 774, 776 (1991); *Commonwealth v. Sherry*, 386 Mass. 682, 696, 437 N.E.2d 224, 232 (1982). Furthermore, proof of lack of capacity may permit a jury, with proper instruction, to conclude that the force necessary to effect the intercourse is sufficient to constitute the force element of rape. *Commonwealth v. Eldridge*, 28 Mass.App.Ct. 936, 937, 549 N.E.2d 1139, 1140, *review denied*, 407 Mass. 1101, 552 N.E.2d 863 (1990).

In *Commonwealth v. Goldenberg*, 338 Mass. 377, 384, 155 N.E.2d 187, 191, *cert. denied*, 359 U.S. 1001 (1959), the Supreme Judicial Court held that "[f]raud cannot be allowed to supply the place of force which the statute makes mandatory." The validity of this holding has been questioned. *Commonwealth v. Keevan*, 400 Mass. 557, 571, 511 N.E.2d 534, 543 (1987) (Abrams, J. concurring) (citing Susan Estrich, *Real Rape* (Harvard University Press 1987), and S. Brownmiller, *Against Our Will: Men, Women and Rape* (1975)); *Commonwealth v. Helfant*, 398 Mass. 214, 221 n.5, 496 N.E.2d 433, 439 n.15 (1986). Furthermore, in *Caracciola* the Court found that the defendant's activities, albeit fraudulent, also constituted force or threats. However, Justice O'Connor's dissent noted that the defendant's activities constituted fraud, and thus warranted dismissal. *Commonwealth v. Caracciola*, 409 Mass. 648, 664, 569 N.E.2d 774, 783 (1991).

[15] The phrase "without her consent" may be submitted for "against her will." *Commonwealth v. Roosnell*, 143 Mass. 32, 40, 8 N.E. 747, 751 (1886) (citing *Commonwealth v. Burke*, 105 Mass. 376 (1870)). See *Commonwealth v. Edgerly*, 13 Mass.App.Ct. 562, 580, 435 N.E.2d 641, 652, *review denied*, 386 Mass. 1104, 438 N.E.2d 75 (1982); *Commonwealth v. Goldenberg*, 338 Mass. 377, 383, 155 N.E.2d 187, 191 (1959).

[16] *Commonwealth v. Dies*, 248 Mass. 482, 489, 143 N.E. 506, 509 (1924). In this case the questions, "Did either of these men have relations with you by your consent?" and "Were you willing or unwilling for these men to do what they did?" were deemed proper to establish the victim's state of mind.

[17] *Commonwealth v. Caracciola*, 409 Mass. 648, 651, 569 N.E.2d 774, 776 (1991); *Commonwealth v. Sherry*, 386 Mass. 682, 688, 437 N.E.2d 224, 228 (1982).

[18] In *Commonwealth v. Merrill*, 80 Mass. (14 Gray) 415, 417 (1860), these factors were called "the usual, proper and essential evidence in support of a charge of intent to accomplish a felonious purpose on the body of a female by force and against her will." See *Commonwealth v. Goldenberg*, 338 Mass. 377, 383, 155 N.E.2d 187, 191 (1959) (fact that none of these indicators were found "negatived the used of force").

[19] See, e.g., *Commonwealth v. Kerr*, 36 Mass.App.Ct. 505, 507–08, 632 N.E.2d 1244, 1245–46 (1994).

[20] *Commonwealth v. Caracciola*, 409 Mass. 648, 652, 569 N.E.2d 774, 776 (1991); *Commonwealth v. Slattery*, 147 Mass. 423, 183 N.E. 399 (1888) (the victim cannot condone or ratify the crime of rape by later excusing or forgiving the perpetrator); *Commonwealth v. Sherry*, 386 Mass. 682, 688, 437 N.E.2d 224, 228 (1982).

## Supplemental Instructions[1]

**(a)    *Use of Force by a Third Person***

**The force or threat of bodily injury does not have to come directly from the defendant. It may be the result of a third person's use of force or threat of bodily injury against the complainant if the defendant is aware of it and takes advantage of it.[2]**

**(a)**

---

[1] These instructions quote the chargebook offered as a guide to Superior Court judges in 1995. The notes that follow are from the same source and have been updated for this text.
[2] *Commonwealth v. Therrien*, 383 Mass. 529, 538–39, 420 N.E.2d 893, 902 (1981). See *Commonwealth v. Coleman*, 30 Mass.App.Ct. 229, 233, 569 N.E.2d 956, 958 (1991) (finding victim submitted to second perpetrator unwillingly and as a result of threats delivered by first perpetrator).

**(b)    *Complainant Unconscious or in a Stupor***

**Furthermore, if by reason of sleep or intoxication or drunkenness or stupefaction or unconsciousness or helplessness a person is incapable of consenting, an act of sexual intercourse occurring with that person during such incapacity is without the valid consent of the incapacitated person.[1] In such cases, the amount of force required may be only that sufficient to effect the act of intercourse.[2]**

ne refers to the rounded eminence situated iphysis, formed by a mass of subcutaneous e, covered by coarse hair at the time of sually limited above by an approximately males this upper limit is similar; its apparent ilicus consists of ordinary body hair.)

l). These two prominent, longitudinal g back from the mons pubis to the perineum, aries of the *pudendal cleft*, into which the a. Each labium has an external, pigmented sp hairs and a pink, smooth, internal surface licles. Between these surfaces is much loose issue, intermixed with smooth muscle resem-; muscle, together with vessels, nerves and nd ligament may end in the adipose tissue part of the labium. A persistent processus l inguinal hernia may also reach a labium . front, where they join to form the *anterior* they do not join but merge into neighbouring almost parallel to each other; with the n they form a low ridge, the *posterior com* the perineal body; this is the posterior limit ral between this and the anus, a distance of ological' perineum.

32). These two small cutaneous folds, devoid ia majora, extend from the clitoris obliquely k for about 4 cm, flanking the vaginal orifice. ior ends may be joined by the cutaneous *ninora*. Anteriorly, each labium minus bifur- issing above the *clitoris* to form with its fellow erhanging the *glans clitoridis*. The lower layer s to form with its fellow the *frenulum clitoridis*. : numerous on the apposed labial surfaces. bial fold (labium tertium) is found on one or : labia minora and majora (Gottlicher 1994). 'his cavity lies between the labia minora. It nd external urethral orifices and the openings *ibular glands*, and those of numerous mucous . Between the vaginal orifice and the frenulum a shallow *vestibular fossa*. For a review of this and Friedrich (1985) and Wendell Smith and

s is an erectile structure, homologous with the )-inferior to the anterior commissure, partially ior, bifurcated ends of the labia minora. The two *corpora cavernosa*, composed of erectile , dense fibrous tissue separated medially by an *ectiniform septum*; each corpus cavernosum is opubic ramus by a *crus*. The *glans clitoridis* is le of spongy erectile tissue; its epithelium has vity, important in sexual responses. The clitoris, '*suspensory*' *ligament* and two small muscles .835), attached to its crura. In many details it the penis, but differs from it basically in being ethra.

**itroitus)** (14.32). This is usually a sagittal slit aferior to the urethral meatus; its size varies f the hymen; like all the vagina it is capable of ing parturition and to a lesser degree during

This is a thin fold of mucous membrane situated ial orifice; the internal surfaces of the fold are ontact each other and the vaginal orifice appears em. The hymen varies greatly in shape and area, annular and widest posteriorly; sometimes it is towards the pubes; occasionally it is cribriform ; absent or form a complete, imperforate hymen d, small round *carunculae hymenales* are its established function.

**il orifice (urinary meatus)** (14.32). This opens o-inferior to the glans clitoridis, anterior to the usually a short, sagittal cleft with slightly raised y distensible. It varies in shape from a round 'escent or stellate form.

**Bulbs of the vestibule** (14.32). These are homologues of the single penile bulb and corpus spongiosum. They are two elongate erectile masses, flanking the vaginal orifice and united in front of it by a narrow commissura bulborum (pars intermedia). Each lateral mass is about 3 cm in length; their posterior ends are expanded and are in contact with the greater vestibular glands; their anterior ends are tapered and joined to one another by a commissure, and to the glans clitoridis by two slender bands of erectile tissue. Their deep surfaces contact the inferior aspect of the urogenital diaphragm. Superficially each is covered by a muscle, the *bulbospongiosus*. Thus the female corpus spongiosum is cleft into bilateral masses, except in its most anterior region, by the vestibule and the vaginal and urethral orifices.

**Greater vestibular glands (glands of Bartholin;** 14.32). These are homologues of the male bulbo-urethral glands; they consist of two small, round or oval reddish-yellow bodies, flanking the vaginal orifice, in contact with and often overlapped by the posterior end of the vestibular bulb. Each opens into the vestibule, by a duct of about 2 cm, in the groove between the hymen and a labium minus. They are not infrequent sources of vulval neoplasms. In microstructure, the glands are composed of tubulo-acinar tissue, its secretory cells columnar in shape, secreting a clear or whitish mucus with lubricant properties, stimulated by sexual arousal. In addition, recent studies have shown the presence of endocrine cells in these and the minor glands of the vestibule, using immunohistochemical methods; their contents include serotonin, calcitonin, bombesin, hCG and katacalcin (Fetissof et al 1989).

**Vessels and nerves.** The arterial blood supply, venous and lymph drainage and nerve supply of the female external genitalia resemble those of homologous structures in males. The arterial supply, from two external and one internal pudendal artery on each side, is massive. Hence, haemorrhage from vulval injuries may be severe. The sensory innervation of the anterior and posterior parts of the labium majus differ, as in the scrotum (p. 1857).

## Anatomy of Pregnancy and Parturition

During pregnancy there are many morphological changes in the female reproductive system and associated abdominal structures (14.33A, B; 34). The uterus enlarges to accommodate the developing fetus and placenta, and there are various alterations in the pelvic walls, floor and contents which allow for this expansion, and also anticipate parturition. At the end of this period dramatic changes take place which facilitate the passage of the offspring through the birth canal. These alterations are often neglected by anatomists, but they represent an important aspect of normal reproductive morphology, with considerable clinical interest.

### Uterine size in pregnancy

The uterus grows dramatically during pregnancy and increases in weight from about 50 g at the beginning of pregnancy to up to 1 kg at term. Most of this gain in weight results from increases in the vascularity and tissue fluid of the uterine wall, together with myometrial growth (see above). The increased growth of the uterine wall is driven by a combination of mechanical stretching as the conceptus grows, and the stimulus of oestrogen. As already noted, the smooth muscle mass of the myometrium is thought to increase mainly by hypertrophy, although there is actually some true hyperplasia earlier in pregnancy.

As pregnancy proceeds, the uterus expands out of the pelvic basin and is usually palpable just above the pubic symphysis by the twelfth week, unless the uterus is retroverted (p. 1874), in which case it may not be palpable in the abdomen until a little later. In past obstetric practice, anatomical surface landmarks such as the pubic symphysis, umbilicus and xiphisternum were used to estimate uterine size and therefore gestational age. So, for example, by the twentieth week of pregnancy the uterine fundus has usually risen to the level of the umbilicus, and by 36 weeks the uterine fundus has reached the xiphisternum. However, with the advent of diagnostic ultrasound (14.34, 35) which allows a reasonably accurate dating of pregnancy, it has become clear that there is great variation in uterine size for a given gestation, and that clinical estimates based on anatomical landmarks are of limited value. In late pregnancy, fetal size and growth can be assessed by serial measurement of the distance between the pubic symphysis and the uterine fundus, but again the symphysis–fundus measurements act primarily as a screening method, with more accurate fetal biometry held in reserve.

### Relations of the uterus in pregnancy

With uterine expansion, the ovaries and uterine tubes are displaced upwards and laterally; the round ligaments become hypertrophied and their course from the cornual regions of the uterus down to the internal inguinal ring becomes more vertical. The broad ligament tends to open out to accommodate the massive increase in the sizes of the uterine and ovarian vessels. The uterine veins in particular can reach about 1 cm in diameter, and for this reason they appear to act as a significant reservoir for blood after uterine contraction. Lymphatics, and also nerves similarly undergo enlargement, although the significance of the increased innervation is not clear, as paraplegic women are able to labour normally, albeit painlessly.

The uterine fundus comes into contact with the anterior abdominal wall at around 16–20 weeks' gestation. Later in pregnancy the increase in intra-abdominal pressure produced by the gravid uterus may produce eversion of the umbilicus. On the skin over the abdomen, a combination of stretching and hormonal changes may produce stretch marks (*striae gravidarum*). In multiparous patients, separation of the rectus abdominis muscles may allow the uterine fundus to fall forwards to some extent.

In the supine position the pregnant woman in late pregnancy is vulnerable to aortocaval compression, as the enlarged uterus presses on and reduces blood flow in the great vessels. Symptoms of nausea and faintness may be obvious, and uteroplacental blood flow may be impaired in some cases.

The jejunum, ileum and transverse colon tend to be displaced upwards by the enlarging uterus, whereas the caecum and appendix are displaced to the right, and the sigmoid colon posteriorly and to the left. Upward and lateral displacement of the appendix in later pregnancy can cause difficulties in the diagnosis of appendicitis. The ureters are pushed laterally by the enlarging uterus and in late pregnancy can be compressed at the level of the pelvic brim, resulting in hydronephrosis and loin pain. However, mild ureteric dilatation is normal in pregnancy, caused by progesterone-induced relaxation of smooth muscle in the ureteric walls. The axis of the uterus is shifted or dextrorotated by the presence of the sigmoid colon and this may lead to inadvertent incision into large uterine vessels at the time of lower segment caesarean section unless the operator is aware of any such rotation.

### Maternal respiration, micturition and colorectal control

As the uterus grows there is some outward displacement of the chest, with flaring of the ribs. Although vital capacity is unchanged, tidal air is said to increase by 200 ml and residual volume to fall by the same amount. The respiratory rate may increase somewhat even in early pregnancy, possibly due to the effect of progesterone, while in late pregnancy, uterine expansion may limit diaphragmatic excur-