UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Cr. No. 04-10038-MLW |
| | ) | |
| DEEPAK JAHAGIRDAR | ) | |
| _____ ) | | |

**DEFENDANT DEEPAK JAHAGIRDAR'S SENTENCING MEMORANDUM**

This memorandum is submitted to the Court in conjunction with the sentencing of defendant Deepak Jahagirdar, currently scheduled for June 24, 2005. The Court still has under advisement Jahagirdar's motion for judgment of acquittal or, in the alternative, for a new trial on Count One. This memorandum will, therefore, address the sentencing issues before the Court both with and without Count One in the case.[1] It will first briefly outline the post-*Booker* sentencing framework and will then address the advisory guidelines calculation. It will argue that, even under the formerly mandatory guidelines, downward departure would have been warranted on the grounds of aberrant conduct and extraordinary charitable and civic contributions. The bases for these arguments are to be found not just in this memorandum but also in the many letters submitted to the Court, clearly written from the heart by persons who know Jahagirdar well, which overwhelmingly and eloquently attest to his good character, his kindness, his generosity, his compassion, and his devotion to assisting those less fortunate, both in the Phoenix community in which he lives and elsewhere.

---

[1] Jahagirdar incorporates by reference his objections/responses to the draft PSR which were submitted to Probation.

Finally, it will outline for the Court Jahagirdar's position regarding the sentence which he requests that the Court impose, either as a matter of downward departure or as a non-guidelines sentence.

## I.    THE POST-*BOOKER* SENTENCING FRAMEWORK.

*United States v. Booker*, 125 S.Ct. 738 (2005), rendered the guidelines "effectively advisory." *Id.* at 757. This advisory system requires courts to consider the applicable guidelines sentencing range ("GSR"), but "permits the court to tailor the sentence in light of other statutory concerns as well, see §3553(a) . . . ." *Ferrara v. United States*, 2005 WL 1205758 at *3  (D.Mass. May 13, 2005), *quoting Booker*, 125 S.Ct. at 757. The district court must determine the applicable guidelines sentencing range ("GSR"), but that GSR is only one factor among the several prescribed in §3553(a) to be considered. *See, e.g., United States v. Gorsuch*, 404 F.3d 543, 545 (1st Cir. 2005); *United States v. Jackson*, 2005 WL 1280992 at *3 (6th Cir. May 24, 2005); *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).[2] After considering all the §3553(a) factors, the court is to "impose a sentence that is reasonable and appropriate." *Ferrara v. United States*, 2005 WL 903196 at *47 (D.Mass. April 12, 2005).

The factors that the sentencing court must consider under §3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed–
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and

---

[2]    The GSR is not automatically to be accorded greater weight than the other §3553(a) factors. *See, e.g., United States v. Moreland*, 366 F.Supp.2d 416, 417 (S.D.W.Va. 2005); *United States v. Hoskins*, 364 F.Supp.2d 1214 (D.Mont. 2005); *United States v. Jaber*, 362 F.Supp.2d 365, 370-72 (D.Mass. 2005); *Simon v. United States*, 361 F.Supp.2d 35, 40 (E.D.N.Y. 2005); *United States v. Biheiri*, 356 F.Supp.2d 589, 593-95 (E.D.Va. 2005); *United States v. Nellum*, 2005 WL 300073 at *1 (N.D.Ind. February 3, 2005); *United States v. Myers*, 353 F.Supp.2d 1026, 1028 (S.D.Iowa 2005); *United States v. Ranum*, 353 F.Supp.2d 984, 985-86 (E.D.Wis. 2005). *But see United States v. Peach*, 356 F.Supp.2d 1018, 1024 (D.N.D. 2005); *United States v. Wanning*, 354 F.Supp.2d 1056, 1060 (D.Neb. 2005); *United States v. Wilson*, 350 F.Supp.2d 910, 912 (D.Utah 2005).

to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes by the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and sentencing range established for–

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . . ;

(5) any pertinent policy statement . . . . ;

    (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct; and

(7) the need to provide restitution to any victims of the offense.

The court must impose a sentence "sufficient, *but not greater than necessary*, to comply with the purposes set forth in [§3553(a)(2)]." §3553(a) (emphasis added). This memorandum will address each of these considerations in turn.

## II.    THE ADVISORY GUIDELINES

### A.    Advisory GSR Calculation.

The PSR has accurately stated the Count One offense level as 27 and the advisory GSR as 70-87 months.[3] Should the Court enter an acquittal on Count One, then Jahagirdar's offense level would be 12, under USSG §2A3.4, the guidelines provision applicable to Jahagirdar's Count Two conviction, corresponding to a GSR of 10-16 months.

The government has requested that Jahagirdar's offense level be enhanced by two levels under §3C1.1 based upon his testimony at trial. Jahagirdar has responded to the government's argument in his objections/responses to the PSR, and that discussion is incorporated herein by reference. Jahagirdar argues herein that a sentence in the advisory guidelines range, even without

---

[3]    Probation has properly used the guidelines as amended effective November 1, 2001, as the current version of §2A3.1 prescribes a higher offense level than did the version of §2A3.1 in effect at the time of the offense of conviction. All references to, or quotations from, the guidelines in this memorandum are to or from the 2001 Edition of the Guidelines Manual.

a §3C1.1 enhancement, would be unreasonable and excessive. Should the Court, after considering

all the §3553(a) factors, agree that a non-guidelines sentence should be imposed, it need not

specifically resolve the question whether a §3C1.1 enhancement would be warranted.

> In one circumstance, . . . precise calculation of the applicable Guidelines range may not be
> necessary. Now that the duty to apply the applicable Guidelines range is not mandatory,
> situations may arise where either of two Guidelines ranges, whether or not adjacent, is
> applicable, but the sentencing judge, having complied with §3553(a), makes a decision to
> impose a non-Guidelines sentence, regardless of which of the two ranges applies. This
> leeway should be useful to sentencing judges in some cases to avoid the need to resolve all
> of the factual issues necessary to make precise determinations of some complicated matters
> . . . .

*Ferrara*, 2005 WL 1205758 at *3, *quoting Crosby*, 397 F.3d at 112. *See also United States v. Haack*,

403 F.3d 997, 1003 (8th Cir. 2005)("We, like the Second Circuit, realize that there may be situations

where sentencing factors may be so complex, *or other §3553(a) factors so predominate*, that

determination of a precise sentencing range may not be necessary or practical" (emphasis added)).

This is such a case.

### B.    Downward Departure.

As Jahagirdar outlined in his objections/responses to the PSR, there are present in this case

two bases which would have justified a downward departure under the former mandatory guidelines

system: (1) aberrant behavior, and (2) extraordinary charitable and civic contributions.[4] This section

---

[4]

18 U.S.C. §3553(b)(2) limits the availability of downward departures to persons convicted
of various sex offenses, including those found in Chapter 109A. While *Booker* expressly excised
only §3553(b)(1), and made no mention of §3553(b)(2) – likely because neither of the cases before
it involved offenses covered by §3553(b)(2) – §3553(b)(2) is cast in the same mandatory terms as
§3553(b)(1) and must be excised for the same reasons which led the *Booker* Court to excise
§3553(b)(1). As the Second Circuit explained:

> We conclude that the *Booker* rationale requires us to consider subsection 3553(b)(2) to be
> excised. Both sections require the use of the applicable Guidelines range, subject to slightly
> different departure provisions, and it was the required use of the Guidelines that encountered
> constitutional objections in *Booker*. Because neither of the defendants considered by the

will address each of these departure bases in turn.

### 1.    Aberrant behavior.

In promulgating USSG §5K2.20, the Sentencing Commission explicitly recognized aberrant behavior as a legitimate basis for downward departure. *See, e.g., United States v. Mikutowicz*, 365 F.3d 65, 79 (1st Cir. 2004). This case manifestly meets the §5K2.20 definition of "aberrant behavior": "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." USSG §5K2.20, comment. (n.1).[5]

---

Supreme Court in *Booker* had violated provisions to which subsection 3553(b)(2) applied, the Court had no occasion to give explicit consideration to the continued viability of that subsection. Nevertheless, now faced with a defendant who has violated provisions covered by subsection 3553(b)(2), we must decide its viability, and we hold that it must be deemed excised. There is no principled basis for distinguishing subsection 3553(b)(1) from 3553(b)(2) with respect to the rationale of *Booker*.

*United States v. Selioutsky*, 2005 WL 1253478 at *2 (2d Cir. May 27, 2005). The Tenth Circuit, the only other court to decide the issue to date, is in accord. *United States v. Yazzie*, 2005 WL 1189822 at *4 (10th Cir. May 20, 2005). *See also United States v. Bailey*, 2005 WL 1119770 at *11 (D.Neb. May 12, 2005)(expressing doubt as to continued validity of §3553(b)(2)).

Moreover, even if §3553(b)(2), which was enacted in 2003, after the date of the offense of conviction, were not excised, its application to limit the availability of downward departure to Jahagirdar would violate the *Ex Post Facto* Clause. "The *Ex Post Facto* Clause raises to the constitutional level one of the most basic presumptions of our law: legislation, especially of the criminal sort, is not to be applied retroactively." *Johnson v. United States*, 529 U.S. 694, 701 (2000). Subsection 3553(b)(2) is substantive penal legislation which restricts the availability of sentences below the guidelines sentencing range to defendants convicted of offenses to which it is applicable. As such, it potentially increases the penalty to be imposed for the offense of conviction and cannot, therefore, be applied retroactively to defendants who could have been granted a downward departure under pre-existing law. *See, e.g., Lynce v. Mathis*, 519 U.S. 433, 439-40 & n.12 (1997); *Miller v. Florida*, 482 U.S. 423, 431-33 (1987); *Weaver v. Graham*, 450 U.S. 24, 30-31 (1981); *United States v. Borer*, 394 F.3d 569, 573 (8th Cir. 2005). *See also United States v. Nunemacher*, 362 F.3d 682, 685-86 (10th Cir. 2004). Even were §3553(b)(2) applicable, however, §5K2.20 expressly recognizes aberrant behavior as a permissible ground for downward departure.

[5]    In determining whether an aberrant behavior departure should be granted, the court "may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record

Based upon the testimony of D.S., the offense of which Jahagirdar was convicted was a single, brief occurrence which could not have been the subject of significant planning and was of very limited duration. The conduct by Jahagirdar to which D.S. testified was, moreover, an extraordinarily marked deviation from Jahagirdar's otherwise law-abiding life, one characterized throughout, as attested by numerous letters submitted to the Court, by caring, gentleness, and giving to others. Jahagirdar was raised in India, in a loving, middle-class family. His own abilities and his family's stress on the importance of education led him to attend, and graduate from, two of the most prestigious educational institutions in India: first, the Indian Institute of Technology, from which he graduated in 1972 with a Bachelor of Technology degree in mechanical engineering, and second, the Jamnalal Bajaj Institute of Management Studies at the University of Bombay, from which he graduated in 1974 with a Master of Management Studies degree, the equivalent of the American MBA degree.

While attending the Institute of Management Studies, Jahagirdar met his future wife Pushpa, who was also a student there. They have had a close relationship from the time they met, so much so that they, both devout Hindus, came to believe that they must have been married in a former life. So much in love were they that in 1977 they insisted upon marrying for love, contrary to custom, which dictated that they submit to marriages arranged by their parents. They have maintained an extremely close and caring relationship, even throughout the ordeal of Jahagirdar's arrest, trial, and incarceration. As Mrs. Jahagirdar has written in a letter submitted to the Court:

> I have known Deepak for 33 years. . . . I have been married to him for close to 28 of those years. During these years he has been a very caring and loving husband and he has been a

---

of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." §5K2.20, comment. (n.2). This list of factors is non-exclusive. *See United States v. Rivera-Rodriguez*, 318 F.3d 268, 275 (1st Cir. 2003).

wonderful and devoted father to our two boys, Rajeev and Sonjeev. He is a very nurturing individual, always ready to help someone in need. His is a spirit of generosity, compassion, kindness, and love. He is a very honest and noble person and I am honored to share his life with him. An incredible source of inspiration to me and the love of my life, he is also my best friend.

Letter of Pushpa D. Jahagirdar.[6]

At the urging of Mrs. Jahagirdar's brothers, who were already in this country, the Jahagirdars, although having established successful careers in India, began to think about coming to the United States to live the "American dream." Once they decided to do so, Jahagirdar, concerned that his Indian degrees would not carry the weight in this country that they did in India, applied to, and was accepted at,  the Harvard Business School. The Jahagirdars emigrated to the United States in 1980. Jahagirdar received his MBA degree from Harvard Business School in 1982; he became a naturalized citizen in 1985. Other than his state and federal arrests for the offense of conviction, Jahagirdar has never been arrested; he has no criminal history whatsoever.

With the exception of brief periods of unemployment which followed lay-offs caused by downsizing, Jahagirdar has been consistently employed in responsible positions since receiving his MBA. At the time of his state arrest for the offense of conviction in March, 2002, Jahagirdar was the Chief Marketing and Development Officer for VistaCare, a Scottsdale, Arizona, company whose mission is to make hospice care available to all terminally-ill people in the United States. Jahagirdar's work with VistaCare was, for him, not simply employment, but a mission to which he was deeply committed personally, having experienced first-hand the great physical and emotional benefits of hospice care to both patient and family when his own mother was dying of cancer. After

---

[6]

    Copies of the letters quoted in this memorandum have been attached. The originals of these letters, as well as others, have been provided to Probation, which will submit the original letters to the Court.

his state arrest, he continued to be employed by VistaCare, although no longer as an officer of the

company; after his January, 2004, federal arrest, he continued to work full-time for VistaCare, but

from his home, until September, 2004, when he began working only on an "as needed" basis. He

remained employed by VistaCare until his conviction in this case, which led to his termination. His

exceptional contributions to VistaCare and to the hospice endeavor are the subject of a letter to the

Court from the Chairman and CEO of VistaCare:

> Deepak was my first hire at VistaCare almost four years ago. Because of that, we shared a
> unique friendship and bond, as well as a common passion to serve others in their final days
> of life. His dream, to bring the gift of hospice to all eligible patients, was expressed in
> everything he said and did, and because of his efforts, literally thousands of patients and
> families have received the gift of hospice. His enthusiasm was infectious and spread
> throughout our entire organization. Quite candidly, we all lost a little something at the time
> of his departure.
>
> Because of the nature of our business and close association, I had the opportunity on several
> occasions to discuss life's more meaningful subjects. Although we do not share the same
> faith, I found him to be one of the most spiritually centered individuals I have ever
> encountered. He spoke openly of his calling to hospice and viewed his personal and
> professional life as an opportunity for continual individual and spiritual growth. He was
> never pious or self-righteous, but instead humble and self-effacing. He was never mean-
> spirited or judgmental, but instead kind and forgiving. He was never disrespectful or
> disgruntled, but instead loving and enthusiastic.
>
> . . . . The hospice industry has lost a voice of meaning and purpose. Our company has lost
> a true leader. And our patients and families have lost a genuine advocate for quality end-of-
> life care. Personally, I have lost the close presence of a very dear friend and associate.

Letter of Richard R. Slager.

Prior to his employment at VistaCare, Jahagirdar was employed from late 1999 through early

2001 by the healthcare consulting division of Computer Sciences Corp. as a Senior Management

Consultant. He was laid off due to downsizing, and was briefly unemployed before joining

VistaCare in August, 2001. Before that, Jahagirdar was employed by Health Net, initially as a

consultant for five months in 1997, and then full-time as the Vice-President for Marketing and

Planning beginning in January, 1998. He was laid off due to downsizing in 1999, and had a brief

period of unemployment before he became employed by Computer Sciences Corp. From 1995-97 Jahagirdar was employed by CIGNA Healthcare; his job was eliminated in 1997. A man with whom Jahagirdar worked at CIGNA writes:

> I have known Deepak Jahagirdar for over 12 years. We worked together while at CIGNA Healthcare. Deepak was my marketing support expert, while I was responsible for sales growth in different geographies. He was bright, hardworking, creative and incredibly caring for all of the people on my team. He was willing to provide whatever support we asked for, which usually meant long hours for him. While my team was motivated, in some part, by the economic incentives the company provided, Deepak responded purely out of a concern for us, as no economic incentive existed for him. Deepak could always be counted upon to lead the discussion to decisions that were consistent with the company's very high ethical standards.

Letter of John J. Wider, Jr.

Consistently with his devotion to assisting others, Jahagirdar's life has been characterized by selfless giving of himself to help those in need. Almost every Sunday for nine years, beginning in 1996, Jahagirdar arose at 5:15 a.m. to serve breakfast to 200-450 homeless people at André House in Phoenix. He was the "banana man," bringing about 200 bananas each Sunday, at his own expense, to include among the food that was served. He helped set up the tables and the food stations and then served food to the homeless; letters which have been submitted attest to the love and care with which he did so. "I have stood next to [Jahagirdar] while serving food to the Phoenix unfortunate over the past several years and have observed him carry out his helpful duties with love, kindness and compassion and always with a smile;" he "has shown an extraordinary willingness to help out at any given time and at any given place without any hesitancy and without asking anything in return." Letter of Noshir F. Daruwalla. Jahagirdar "has touch[ed] the hearts of the many homeless folks who have gotten to know him over the years." Letter of Pravin Bolar. He was unfailingly "kind, gentle and loving" and was always "one of the last to stop serving the food and drink." Letter of Brother Richard Armstrong. He "sincerely cherishes and enjoys the opportunity to help," and when he is

serving the homeless "an abundance of love . . . radiates from his very being." Letter of Sagran S. Moodley. He is a "person with compassion for the needy and dedication to bringing happiness to the poor and homeless" who "talks to each one of the homeless" and "bring[s] smiles to their faces with his loving and compassionate words." Letter of Venkata Kota.

Including the time it took him to travel to André House and then return home after helping with the clean-up, he devoted about 5 hours almost every Sunday, year after year. In addition, the group which served the food on Sunday mornings met every Saturday for about two hours to make the sandwiches for the next day, in which he also participated. Jahagirdar continued to serve breakfast at André House up to and including the Sunday before he came to Boston for his trial.

Jahagirdar and his wife Pushpa, along with other members of their church group, also cooked and served a meal once a month, again contributing food at their own expense, at a shelter for battered women and needy families operated by the United Methodist Outreach Ministry ("UMOM"), cooking for 150-200 people, many of whom were children. *See* Letter of Emily Maurer, Volunteer Coordinator, UMOM New Day Centers. In addition to serving on the Salvation Army advisory board for a period of time and then as a member of the cabinet, to which activities he contributed 8-10 hours a month until 2001, Jahagirdar annually participated in the Salvation Army bell-ringing activities and also worked every year with its Angel Tree program, a program which provides toys for children who would otherwise go without at Christmas, volunteering at a booth set up at a local mall and working in the warehouse where the toys were stored prior to distribution. These holiday-related activities continued through the 2004 holiday season. Many of the letters which have been submitted attest to the devotion, enthusiasm, kindness, and caring which Jahagirdar brought to these activities which affected the lives of so many of Phoenix's homeless and unfortunate.

In addition to the extensive devotion of his time and energy to civic and charitable activities, the Jahagirdars contributed $4,000 to $5,000 per year in money and in-kind contributions to various charitable and civic organizations, including the Salvation Army,[7] specialty hospitals in India which provide sophisticated medical care to people who cannot afford it,[8] a public school in Phoenix set up to cater to the needs of homeless children, and the Phoenix Boys' and Girls' Club.

Numerous letters submitted to the Court on Jahagirdar's behalf attest to the wholly aberrant nature of the offense conduct of which Jahagirdar was convicted in terms of the way in which he has lived his life and related to others throughout his personal and professional relationships with them. Letter after letter speaks to his kindness, compassion, gentleness, spirituality, as well as to the complete absence of any hint of impropriety in his dealings with others. For example, a neighbor and friend writes that in the ten years he and his wife have known Jahagirdar, "we have learned that he is highly intelligent, deeply spiritual, concerned and caring about his family and friends, and absolutely never aggressive, violent or devious in any way" and that "the act for which he has been convicted was completely out of character." Letter of Jerome and Cheryl Lebo. In all of her interactions with him, the VistaCare Vice-President of Human Resources, who had traveled with Jahagirdar to many locations and seen him interact with employees at all levels, "*never saw him behave in any way that would be considered inappropriate, sexually or otherwise*" (emphasis in original). Letter of Patricia Gussert Schrock. The former Chairman and CEO of VistaCare writes that he "[has] never witnessed Deepak display anything but kindness and gentleness toward his coworkers and associates," nor had he "[ever] seen anything in his behavior that would indicate that

---

[7] *See* Letter of Lt. Col. Don R. Mowery, Divisional Commander, Salvation Army.

[8] *See* Letters of Kalpana Batni, President, India Association of Phoenix; Vasudeva P. Atluri, President, Indo-American Cultural and Religious Foundation of Arizona, Inc.

he would be a threat to anyone." Letter of Barry M. Smith. A friend of eight years describes Jahagirdar as "a thorough gentleman, a man of compassion, love, and warmth, humble, peace loving and most caring," " a gentle, kind-hearted individual, who has a positive impact on everyone around him." Letter of Sagran S. Moodley. Friends of 9-10 years write that Jahagirdar "has always been of exemplary character, always very helpful and loving," and had never "demonstrate[d] any unbecoming behavior," Letter of Noshir F. Daruwalla, that Jahagirdar "is a kind and compassionate man with an impeccable character," Letter of Dr. Krishnan R. Bala, that he is a man of "high moral character," Letter of William and Jean Mack, and that he is "religious, honest, sensible, [and] sensitive." Letter of Peri Shankar. Friends of more than ten years describe Jahagirdar as "a very cultured, educated, pious, compassionate, and caring individual, whose contributions to society through his work and charitable activities are matched only by his passion for helping others;" they found the charges against him shockingly "contrary to his character and personality." Letter of Ashok and Nandini Kanagal. The offense of which Jahagirdar was convicted was "completely at variance with the rest of his life's work and spiritual beliefs." Letter of Robert E. Anderson (HBS classmate). A co-worker for several years writes that "it is very difficult for me to accept that the wonderful man I know could ever foist himself on any one for any reason;" she had "been with Deepak in both work and social situations, in all types of settings, at all hours of the day and night," and found Jahagirdar "impeccable in his manners" and "never . . . inappropriate." Letter of Leslie D. Smith, R.N.

The love, respect, and admiration of his sons is evident in every word they have written of him. His eldest son, Rajeev, a senior at Washington University in St. Louis, who has just completed a semester at Oxford University, writes:

My father is honest, loving, wise, and unselfish. In my twenty-one years of life, I have never known my father to ever misrepresent the truth. It was he who taught me that honesty is the

best policy. I think that . . .  the fact that his family has stood staunchly by his side say[s] a lot about the moral substance of this man. A self-made immigrant from India, my father gave me the ambition that I have today. He taught me that I could be anything I wanted to be, and today I am studying at a top university in the world. He taught me the all-American values of hard work, integrity, and honor. My father has always been an exemplary father to my brother and I. He has always been there for us, and I will be eternally grateful for his guiding hand and his friendship. He was and is an active, involved father. He is a necessary and important part of who I am.

I know of few other men who live the word of God the way my father does. . . . He is a model American citizen – someone who worked hard, fulfilled to the maximum the potential of the American dream and never lost his grounding along the way. He has always put the less fortunate ahead of himself. A line that he has often times repeated to me is: "From those to whom much is given, much is expected." I believe that he has lived by that philosophy in an extraordinary manner all his life.

Letter of Rajeev Deepak Jahagirdar (emphasis omitted). Eighteen-year-old Sonjeev, a sophomore

at the University of Arizona, writes:

My earliest memories of my father are of him driving me long distances in the wee hours of the day to my hockey games when I was very young. When I think of him then, I can clearly remember all the love and joy he was filled with every weekend when he could go on these long trips with me. This sacrifice he would make for me every weekend and it is a great example of how dedicated a father he has always been. To this day, he takes great pleasure in being a part of my life and is an outstanding father. He is a man who has taught me to appreciate good values and my education; at the same time, he is also my dear friend who will drop everything he was doing to come help me when I am in a difficult or stressful situation. . . . . I look to my father for guidance when I am unsure, for comfort when I am distressed, and for love when I am in need of a friend. He is truly a good person and has a lot to offer all those around him.

Letter of Sonjeev Jahagirdar. A consistent theme throughout the letters submitted to the Court on

Jahagirdar's behalf is his evident devotion to his wife and children. For example:

Deepak is one of the most gracious, intelligent, and spiritual family man I've ever met. He loves his wife and sons deeply. Deepak's eyes simply light up when he speaks of them. Some would say that it is possible to tell the type of person a man is by the way he treats his wife and how he has reared his children. I believe this is very true. What I have seen repeatedly is a man who is deeply devoted to and cherishes his wife. Deepak also has the same feelings for his sons. Deepak and Pushpa's sons demonstrate clearly the type of people their parents are. Their sons are model students and citizens, and enjoy a very loving relationship with their parents.

Letter of Leslie D. Smith, R.N.[9]

Letters from other members of his family echo the perceptions of Jahagirdar expressed by his wife, his children, and his friends. Jahagirdar's niece recounts that "[a]ll who have come across my Uncle have always remarked to me how lucky they are to have met such a special person, who makes them feel valued and loved as if they were the only person on Earth." Letter of Aarti V. Nandwani. Jahagirdar's brother-in-law, who has known Jahagirdar for almost 30 years, knows him "to have nothing less than an impeccable character," to be "very compassionate, truthful, and honest," and a man who "has been a very fine brother to us all and a very fine husband to my sister." Letter of Ramesh S. Ramchandani. Another brother-in-law, who has known Jahagirdar for 15 years, writes that Jahagirdar is an "exceptionally decent and honest individual who always puts others' welfare above his own," "principled, loving, and caring." Letter of Pratik Gupta.

The offense conduct of which Jahagirdar has been convicted is almost incomprehensibly at odds with the life which Jahagirdar has lived for 54 years and with the character and conduct which his family and people who know him well have observed for many years. A departure from the guidelines would have been warranted on this basis even under the former mandatory guidelines

---

[9]

    *See, e.g.*, Letter of Pravin Bolar ("He loves his family and is a very supportive and caring father"); Letter of Ashok and Nandini Kanagal ("As a parent, he has done a remarkable job that we can only hope to emulate[; h]is children have grown up to be remarkable young men with keen intellect, an outstanding academic and community service track record, and an outlook in life which will no doubt make them very valuable contributors to our country and our society"); Letter of William C. Weese, M.D. ("He is totally devoted to his family and a wonderful source of inspiration and guidance to his sons"); Letter of Jyotsna Gupta (sister)("I have witnessed him having positive and wonderful relationships with his family and friends[; h]e has a very close knit immediate family and is greatly loved by his wife and children"); Letter of William and Jean Mack ("I, Jean Mack, an educator with 40 years experience, have observed in him the parenting characteristics that I wish were present in *all* parents" (emphasis in original); Letter of Linda Dall ("He was a very involved, protective parent; a part of a very loving, happy family"); Letter of Mahindra and Mythili Bardwaj ("He has been an excellent parent always caring for his children and family and has been an inspiration to them").

system.[10] This is truly an extraordinary case.

### 2. Extraordinary charitable and civic contributions.

Also extraordinary are the civic and charitable contributions made by Jahagirdar to the needy and disadvantaged of the Phoenix community and to needy and sick people in India. These are not simply the sort of checkbook donations which society might expect of a business executive, nor are they only the sort of contributions of time which the First Circuit has indicated may not be extraordinary for a "prominent corporate executive." *See United States v. Thurston*, 358 F.3d 51, 79-80 (1st Cir. 2004).[11] What is extraordinary in this case is not just the time which Jahagirdar

---

[10]

Jahagirdar has argued that the Court should not impose a §3C1.1 enhancement on the basis of his trial testimony, but even were the Court to conclude that he testified falsely at trial, this case is not controlled by *United States v. Bradstreet*, 135 F.3d 46, 56-58 (1st Cir. 1998), or *United States v. Mikutowicz*, 365 F.3d 65, 79-80 (1st Cir. 2004), in which the First Circuit ruled that aberrant behavior departures were not permissible when a defendant convicted of "felonious dishonesty" testified dishonestly at trial. Neither *Bradstreet* nor *Mikutowicz* was considering the availability of departure under §5K2.20; they were instead construing the availability of the departure under this Circuit's pre-§5K2.20 standard, as articulated in *United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir. 1996). Section 5K2.20 controls the applicability of the aberrant behavior departure in this case; while it categorically rules out the departure under a number of specified circumstances, it contains no mandatory exclusion for defendants who testify falsely at trial, nor does it expressly include the defendant's testimony at trial in the list of non-exclusive factors which a court may consider in determining whether such a departure is appropriate in a given case. Clearly, the Commission did not regard false testimony at trial as rendering the defendant automatically ineligible for departure under §5K2.20. Moreover, the offense of which Jahagirdar was convicted did not involve "felonious dishonesty," of which the First Circuit viewed the false trial testimony of the defendants in *Bradstreet* and *Mikutowicz* as a repetition, evidencing, in the Court's view, that the dishonesty of which the defendant had been convicted was not a limited, aberrant occurrence in the defendant's life. The same cannot be said in this case, in which *everything* in the defendant's life is inconsistent with both the offense conduct of which he has been convicted and the prospect of such a thing ever happening in the future.

[11]

Jahagirdar has neither the wealth nor the prominence which Thurston apparently had. More to the point, however, a paramount concern of the First Circuit in reversing the downward departure in that case was to avoid perpetuating the disparities in sentencing for "white collar" and "blue collar" crimes which it was a goal of the guidelines to minimize. The offense of which Jahagirdar was convicted was not a white collar crime, nor was it in any way comparable to the massive health care fraud of which Thurston was convicted; the First Circuit stressed the fact that "Thurston's

devoted, week after week, year after year, to helping the needy and homeless of Phoenix, as discussed at pages 9-11, *supra*, but the fact that helping others is for him an essential part of his existence, an inextricable component of who he is as a person.

Jahagirdar's charitable endeavors are the product of a deeply internalized spiritual belief system which, as a host of the letters submitted to the Court eloquently attest, led him not just to perform charitable activities but to do so with love, caring, and devotion which had a positive impact on hundreds and hundreds of people in the Phoenix community and to instill in his sons the understanding that community service was an essential component of living in the world. *See United States v. Mehta*, 307 F.3d 270 (D.Mass. 2004). Jahagirdar "is known for his compassion towards the needy, and for his sincere desire to 'give back,'" which he does with an "abundance of love that radiates from his very being." Letter of Sagran S. Moodley. He "has a deep conviction about helping the less privileged people in the society." Letter of Pallav Acharya. He has "on many occasions, . . . sacrificed his personal time and resources for helping the needy and the less privileged, not only amongst his own community but crossing social and religious lines." Letter of Mahindra and Mythili Bardwaj. He is "deeply spiritual and religious," Letter of Ramesh Ramchandani, and "has a deep conviction about helping the less privileged people in society." Letter of Pallav Acharya.[12] As the

─────────────────

executive position . . . , which gave him the resources to undertake many of his charitable works, also enabled him to commit the crime." *Id.* at 81. *See also United States v. Cacho-Bonilla*, 404 F.3d 84, 95 (1st Cir. 2005). The offense of which Jahagirdar was convicted bore no relationship whatsoever to his executive employment or to his charitable and civic activities.

[12]

    Jahagirdar  has also given unstintingly of himself in helping others, particularly young people, make decisions which will affect their lives. *See, e.g.,* Letter of Denica Moodley ("Over the years, he has not only been there as an advisor and mentor but also as a friend who has enthusiastically listened and helped me with my teenage troubles . . . ;" "for me and for the many other lives he has touched, Uncle Deepak is truly irreplaceable"); Letter of Narasimharao Dunigalla Venkat  (discussing Jahagirdar's help to his son); Letter of Bellave and Lakshmi Jayaram ("Ever since we first met them, Deepak and Pushpa have made us feel part of an extended family, offering encouragement, giving moral support, imparting valuable advice and providing enthusiastic

letters which have been submitted attest, many are those who pray for Jahagirdar's return to his community to continue the good works and positive influence which he has brought to the community and individuals in it. His contributions in this respect have been truly extraordinary.

## III.    THE OTHER §3553(a) FACTORS.

### A.    The History and Characteristics of the Defendant.

Whether or not the Court concludes that downward departure under the guidelines would have been warranted under the former mandatory guidelines scheme, all the history and characteristics of Jahagirdar addressed in the preceding section are relevant to post-*Booker* sentencing under §3553(a)(1).[13] So, too, are formerly discouraged or even prohibited factors such as Jahagirdar's age (§5H1.1), his education and vocational skills (§5H1.2), his employment record (§5H1.5), his family ties and responsibilities (§5H1.6), and his charitable and civic contributions (§5H1.11). *See* 18 U.S.C. §3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence"). *See also Jaber*, 362 F.Supp.2d at 376 n.21 ("*Booker* plainly allows courts to look carefully at [the §5H1] factors and to determine to what degree they are relevant to individual cases"); *Ranum*, 353 F.Supp.2d at 986 ("The guidelines' prohibition of considering [the §5H1] factors cannot be squared with the §3553(a)(1) requirement that the court evaluate the 'history and characteristics' of the defendant");

---

optimism when sorely needed"); Letter of Aarti Nandwani (niece)("I have always looked to him as a close friend, confidante, and a loving fatherly figure . . . ."); Letter of Sagran S. Moodley ("Deepak took the time to share with me his insights about the [healthcare] industry and helped me think through the [employment] opportunity carefully so that I could make the best decision for my family and my career[; h]e has also helped my two teenage children with their college and career selection decisions").

[13]Defendant incorporates herein the discussion at pages 5-17, *supra.*

*cf. Nellum*, 2005 WL 300073 at *1 ("many of the §3553(a) factors – such as the history and characteristics of the defendant – are factors that the guidelines either reject or ignore").

Jahagirdar's history and characteristics are all overwhelmingly positive. He is 54 years old and, before the offense of conviction,  had never before been charged with a crime. He has been consistently employed, first in the engineering field and then for the past 18 years in the healthcare field, most recently in bringing to fruition his vision of hospice care for all eligible terminally-ill patients. He has a close-knit and loving family, and his presence in the lives of his wife and children is indispensable to them. As his wife has written:

> He is a very precious part of our family. My boys need his daily guidance and presence in their lives as they make their transition from boyhood to manhood. As for me, I cannot imagine a life without him. He is mu anchor, my soul mate, my very life. He has so much to offer society. He has always made a difference in the communities he has lived in over the years. Please show him mercy and don't let this one moral lapse define his life. He is deeply spiritual and very religious and I know he has and continues to spend a lot of time meditating and seeking God's forgiveness for the lapse. It is something he will always have to live with. . . .  My boys and I need him in our lives . . . .

Letter of Pushpa D. Jahagirdar. Jahagirdar has devoted his life to doing good in the world, to bringing care and comfort to the needy, the homeless, and the sick, to providing a positive role model to his children and the children of others, and to other members of the community as well. Jahagirdar's history and characteristics all point squarely to the appropriateness of a sentence well below the advisory GSR. The appropriateness of such a sentence becomes even more evident when the remaining §3553(a) factors are considered.

## B.     The Nature and Circumstances of the Offense.

The offense conduct described by D.S. was plainly a single, unpremeditated occurrence which was, as has already been addressed, wholly at odds with who Jahagirdar is and how he has lived his life. Without in any way denigrating the seriousness of the offense of conviction, it was, in terms of the sexual assaults which fall within §2A3.1, very much at the least serious end of the

spectrum. There was no violence, there were no threats, and there was no action on Jahagirdar's part which rendered D.S. "incapable of appraising the nature of the conduct" or "physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act." §§2242(2)(A), (B). Sexual abuse punishable under §2242 can be anything from full penile penetration of the vagina or anus or mouth, with ejaculation, to the incursion of a finger beyond the labia but not into the vaginal orifice (assuming the correctness of this Court's construction of "genital opening"in §2246(2)©[14]), all of which would have a base offense level of 27 under §2A3.1. While certainly no woman should be subjected to the invasion to which D.S. testified, the conduct on Jahagirdar's part to which she testified plainly fell at the very least invasive end of the §2242 spectrum.

## C.    The Purposes of Sentencing.

The Court must also consider the purposes of sentencing, which are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; © to protect the public from further crimes by the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §3553(a)(2). Critically, §3553(a) mandates that the Court impose a sentence "sufficient, *but not greater than necessary*, to comply" with these purposes (emphasis added). The nature and circumstances of the particular offense conduct at issue in this case mitigate in favor of a sentence below the advisory GSR. *See* Section III(B), *supra.* Respect for the law would be promoted by the individualization of

---

[14]

It has been, and remains, Jahagirdar's position that the evidence did not suffice to prove beyond a reasonable doubt that his finger penetrated D.S.'s genital opening within the meaning of §2246(2)(C).

the sentence imposed upon Jahagirdar to take account of his exemplary record of contributions to the Phoenix community, to the hospice movement, and to the sick and destitute of India, and of the fact that the offense conduct of which he was convicted is wholly at odds with Jahagirdar's history and character. The Court has received letters from many people, both in the Phoenix community and elsewhere, who know Jahagirdar well and who have expressed their firm convictions that the world would be a better place with Jahagirdar able to return to his community and to continue the work of helping others to which he has devoted so much of his life rather than with Jahagirdar behind bars. A sentence below the advisory GSR would generate respect for the law by demonstrating that it can be both reasonable and just, not only to Jahagirdar, but to his family to which he means so very much, and also to his community.

Any consideration of what is just punishment for the offense of conviction should take into account what Jahagirdar has already suffered and will continue to suffer. He has lost his employment, which meant far more to him than simply a job; it represented his ability to work for a cause in which he believes deeply – universal availability of hospice care – which has the capacity to ameliorate the suffering of thousands and thousands of terminally-ill patients and their families and friends every year. Given his conviction, he may never again be able to obtain a responsible position in the healthcare field again, a likelihood that he finds inexpressibly painful. The financial impact of his conviction upon him and his family has been, and will likely continue to be, catastrophic.[15] He has also been deeply humiliated in front of his family and his community, another source of considerable pain, as many of the letters submitted attest. The thought of being unable to

---

[15]

Mrs. Jahagirdar had not been employed outside the home since the birth of the couple's oldest son. She recently became employed again, but her long absence from the workforce has limited the employment opportunities available to her and will likely continue to limit her overall earning potential.

be available to his sons whenever they need his help and guidance is a source of daily agony, as is the pain he has caused to his wife.

A sentence within the GSR is not necessary to protect the public from Jahagirdar – it needs no protection from him, as all the information before the Court provides strong assurance that he will not commit crimes in the future. In addition, the public interest will be addressed by the fact that Jahagirdar will be required to register as a sex offender – severe punishment in itself for a person such as Jahagirdar. Nor is a sentence within the GSR necessary for purposes of either individual or public deterrence against conduct such as that on which Jahagirdar's convictions were based.[16]

## IV.    CONCLUSION

The §3553(a) factors other than the advisory GSR all point squarely to the appropriateness of a sentence below the advisory GSR – under the circumstances of this case and this defendant, a sentence within the GSR would not be reasonable or appropriate. The Count One sentence for Jahagirdar  that appropriately balances all the §3553(a) factors, and which is not greater than necessary to accomplish the purposes of §3553(a)(2), would be one which sentences him to time served, a term of home confinement, and a term of supervised release, a condition of which would require Jahagirdar to perform substantial community service. Given the fact that Jahagirdar has lost

---

[16]    There is no need for incarceration to provide Jahagirdar with educational or vocational training or medical care or other treatment. A non-guidelines sentence for Jahagirdar would not produce any *unwarranted* disparity in sentencing among defendants *with similar records* who have been found guilty of *similar conduct.* In addition, a relevant disparity consideration is the fact that this case originated as a state prosecution in March, 2002; the state prosecution was dismissed in favor of the federal prosecution, which was commenced in January, 2004. It is highly unlikely that a state sentence for the offense conduct described by D.S. would have remotely approached even the 70-month bottom of the Count One advisory guideline range. As this Court stated during the sentencing proceedings in *United States v. Glavin*, No. 04-10093: "every time one person is brought to federal court and other people similarly situated are left in state court, there's a kind of disparity generated that our system hasn't' up to this point recently recognized."  Tr. 2/4/05 at 42 (excerpt attached).

his job and is unlikely to find employment which will be remotely comparable financially, he asks

that the Court impose only a minimal fine. Should the Court grant an acquittal on Count One, then

Jahagirdar requests that the Court impose a sentence of probation on Count Two.

Respectfully submitted,

By his attorneys,

/s/ Kimberly Homan
Kimberly Homan
Mass Bar No. 239000
20 Park Plaza, Suite 905
Boston, Massachusetts 02116
(617) 227-8616

/s/ James W. Lawson
James W. Lawson
Mass. Bar No.289300
OTERI, WEINBERG & LAWSON
20 Park Plaza, Suite 905
Boston, Massachusetts 02116
(617) 227-3700

Date: June 10, 2005