UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10038-MLW |
| | ) | |
| DEEPAK JAHAGIRDAR | ) | |
| | ) | |

**Government's Sentencing Memorandum**

The United States of America, by and through Assistant United States Attorney John T. McNeil, respectfully files this sentencing memorandum, including its opposition to the defendant's arguments for downward departures from the Sentencing Guidelines.

The applicable Sentencing Guideline range for the defendant is 87-108 months (7.25-9 years) if the Court determines that the defendant testified falsely at trial and applies the obstruction enhancement at U.S.S.G. § 3C1.1. In the absence of this enhancement, the defendant's guideline range is 70-87 months (5.8-7.25 years).

The defendant proposes a radical downward departure, arguing that he should serve no incarceration beyond the time he has served between conviction and trial, an unspecified period of home confinement, community service, and a "minimal fine." The defendant's recommendation is based in large part on his claim that his crime reflects "aberrant conduct" and that he has made extraordinary charitable and civic contributions over the last several years.

As outlined below, in sentencing the defendant, the Court must place considerable weight on the nature of the crime and the psychological impact of the crime on the victim. Moreover, this Court should not grant a downward departure based on aberrant conduct because it runs directly counter to recently articulated public policy regarding sexual assault crimes. The defendant's trial perjury and failure to mitigate the harm of his conduct also conflict with such a

1

departure. In addition, the Court should reject Jahagirdar's argument that he should be granted a downward departure based on community service. While his service is commendable, it is not of a nature or of a quantity that is atypical or otherwise outside the heartland of the Guidelines.

### Victim Impact

The Court has been provided through the PSR and the Defendant's Sentencing Memorandum a substantial amount of information regarding the defendant's personal history and the impact that a sentence of incarceration will have on his family and friends. While this information is relevant to sentencing, the Court should ensure that greater weight be attributed to the extraordinary psychological impact of Jahagirdar's sexual abuse on D.S . While his act of sexually abusing D.S. occurred over a short period of time and did not result in substantial physical harm, the injury to D.S.'s psychological well-being and her sense of personal security is both deep and permanent.

At the time of the instant offense, D.S. was a 22 year old woman living at home with her parents and her brother. She was alone and sleeping soundly aboard Delta Flight 2100 on her way home from vacation when Jahagirdar assaulted her. Jahagirdar was a complete stranger and more than 30 years older than she when he covered her with a blanket and then unbuttoned and unzipped her pants. Without D.S.'s knowledge, and shielded from the view of passengers and flight crew who could have prevented the assault, Jahagirdar put his right hand on her body and slid it down the front of her opened pants. He then digitally raped D.S. by "grabbing her vagina."

D.S.'s brief victim impact statement must be evaluated in the larger context of the unique

psychological impacts of a sexual assault on a young woman.[1] Sex offenses are distinguishable from other crimes because of their profound and unique psychological effects. "The carving up of a rape victim's soul is an invisible crime, but the victim is no less maimed than the victim of a physical assault. Moreover, while broken bones heal and even scars can often be eliminated with plastic surgery, psychological trauma has no end." See Lynn Hecht Schafran, *Maiming the Soul: Judges, Sentencing and the Myth of the Nonviolent Rapist*, 20 Fordham Urb. L.J. 439, 446 (1993).   The nature of the act is personally invasive in a way that is unlike any other crime. See Roxanne Lieb, Vernon Quinsey, and Lucy Berliner, *Sexual Predators and Social Policy*, 23 Crime & Just. 43, 48 (1998).  Rape is also unique because of the shame and stigma associated with it. Panel Discussion, *Men, Women and Rape*, 63 Fordham L. Rev. 125, 130-133 (1994).

The crimes of rape and sexual abuse are also plagued by myths and misinformation.  The concept of a nonviolent rape is one of such myths. "Although the vast majority of rapes are "simple rapes" involving nonstranger assailants and no injuries apart from the penetration itself, the Rape in America Study concluded that rape is so prevalent and so traumatic that it is a major determinant of American women's mental health." *Maiming the Soul*, 20 Fordham Urb. L.J. at 447-453.  In fact, most rape victims do not suffer serious physical injuries from the crime, but "are substantially more likely to experience major health problems, such as depression and risk of suicide, relative to women who have never been raped." 63 *Fordham L. Rev.* at 136-37.[2]

---

[1] A copy of D.S.'s victim impact statement (with her name redacted) is attached as Exhibit 1.

[2] Rape victims report various forms of serious emotional harm or some form of post traumatic stress disorder, which is characterized by diminished self-worth, fearfulness and anxiety, hostility and blame, sleeplessness, phobic responses, coping difficulties, depressed

Victim D.S. has been profoundly affected by this assault. It occurred when she was most vulnerable – while she was sleeping and alone, unable to detect or prevent the attack. It was committed by a complete stranger in close quarters, and the attack invaded not only the most intimate part of her body, but her privacy and dignity.

In her written statement to the Court, D.S. wrote that she "thinks about what happened everyday," even three years after Jahagirdar's assault. She wrote that she "will live with this [for] the rest of my life." She noted not only the physical violation perpetrated by Jahagirdar, but of the emotional violation he caused. She has been able to cope with the "emotional roller coaster" induced by Jahagirdar's assault only through the support of family and friends.

D.S.'s traumatization did not end with Jahagirdar's assault on the aircraft. She had to recount the crime to strangers repeatedly – to the flight attendants, to law enforcement officers, to medical personnel, to prosecutors, to grand jurors, and to a jury – each time, etching the crime deeper into her psyche. D.S. had to submit to a medical examination, including an examination of her genitals. That examination was initiated to complete a "rape kit" – that is, to have evidence of a crime taken from her body. She also had to surrender her clothing as evidence of the crime, and return home after the examination in hospital garb.

Like many sexual assault victims, D.S. was also re-traumatized by testifying at trial. She wrote, "that was[,] and probably will be[,] the hardest thing I do in my life." She wrote of the difficulty of seeing the man who assaulted her in court, and of the embarrassment and stress of

---

expectations for the future, extreme fear and helplessness. See Kathryn Carney, *Rape: The Paradigmatic Hate Crime*, 75 St. John's L. Rev. 315, 345 (2001). Additionally rape victims are likely to have psychological symptoms such as depression or withdrawal. *Id*. "Resolution of the trauma is never final, recovery is never complete because the impact of a traumatic event continues to reverberate throughout the survivor's lifecycle." See 20 Fordham Urb. L.J. at 447.

testifying in detail about the assault before a group of complete strangers.  The trial traumatization of victims of sexual abuse is particularly acute because they have to speak about a subject which is not ordinarily spoken about: the details of an assault on their genitals.  In addition, sexual assault victims also worry that the jury is judging them and their conduct.  These victims are often terrified that the jury will conclude that "she asked for it" or that the victim did something which would indicate that she welcomed the violation of her body.

D.S. wrote: "I have lost my ability to feel safe."  In the end, even though Jahagirdar was apprehended shortly after the assault, and has been convicted of sexually abusing D.S., she does not feel safe from this kind of invasion.  Jahagirdar took from her an extraordinarily precious thing – a sense of personal security.

## Obstruction Enhancement

Jahagirdar's offense level should be increased by two levels pursuant to U.S.S.G. § 3C1.1. because he committed perjury in testifying at trial.  Among the specific material false statements the defendant made under oath were: D.S. initiated the physical contact between the two of them; D.S. took Jahagirdar's hand in hers and then placed it on her body; D.S. directed Jahagirdar's hand down the front of her pants; D.S. began moving under his hand, responding to his sexual stimulation of her;  Jahagirdar attempted to remove his hand from the front of D.S.'s pants and she resisted; when D.S. left her seat she made no statement to him and did not confront him; D.S. consented to Jahagirdar's physical contact with her; Jahagirdar did not see law enforcement officers on the jetway until after the Secret Service agent placed his hand on him.  Of these false statements, the most substantial was Jahagirdar's testimony that D.S. consented to his conduct.  If believed by the jury, this statement provided him a complete defense to both charges because the government was required to prove as an element of the offense that D.S. was

5

"incapable of appraising the nature of the conduct and was physically incapable of declining participation in, or communicating unwillingness to engage in [the sexual act]." See 18 U.S.C. §§ 2242(2) and 2244(a)(2).

While the Court must make an independent finding under U.S.S.G. § 3C1.1., it is notable that the Jahagirdar's testimony – particularly his testimony regarding consent – is irreconcilable with the jury's verdict in this case. Moreover, given that this testimony was offered as part of the defendant's case in chief, rather than in response to unexpected cross-examination, the Court can conclude that this false testimony was the product of substantial planning and deliberation by Jahagirdar. As such, there is no basis for concluding that the false testimony was the product of "confusion, mistake or faulty memory." See United States v. Dunnigan, 507 U.S. 87, 94 (1993); U.S.S.G. § 3C1.1. comment (n.3). This type of perjury – calculated, detailed testimony which strikes at the heart of the charges – constitutes precisely the type of conduct for which the obstruction of justice enhancement applies. See U.S.S.G. § 3C1.1. comment (n.4.(b)); United States v. Fox, 393 F.3d 52, 61-62 (1st Cir. 2004)("carefully crafted" nature of testimony was basis for a finding of intentional false testimony and applicability of sentencing enhancement); United States v. D'Andrea, 107 F.3d 949, 958-59 (1st Cir.1997).

**Public Policy Against Departures in Sexual Abuse Cases**

The defendant has moved for a radical departure from the Guideline sentencing range in this case. Any motion for a downward departure in a sexual assault case must be viewed in the context of Congress's extraordinary actions two years ago to eliminate nearly all departures in such cases. In 2003, Congress enacted the PROTECT Act which not only substantially increased the statutory penalties for certain sex offenses, but substantially reduced the availability of guideline departures for these offenses. See Pub. L. No. 108-21, 117 Stat. 650

(April 30, 2003).  Congress's sense of outrage over substantial departures in sexual assault cases is noted in the House Conference Report:

> According to the Sentencing Commission's 2001 Sourcebook of Federal Sentencing Statistics, trial courts reduced the sentence of those convicted of all non-immigration offenses in 12.2 percent of the cases while those convicted of sexual abuse received a downward departure over 16 percent of the cases, and granted reductions below the guideline range of those convicted of sexual abuse by an astonishing 63 percent from the guideline range. For those convicted of pornography and/or prostitution related offenses, trial courts departed from the recommended guidelines over 18 percent of the time, reducing these defendants' sentences by a staggering 66 percent.

House Conference Rpt. 108-66 at 58-59 (2003), reprinted at 2003 U.S.C.C.A.N. 683, 693.

The public policy behind the PROTECT Act – to ensure substantial sentences for all sex offenders, including first-time offenders, in order to provide general deterrence, to express society's outrage over such conduct, and to severely punish sex crimes – drove Congress to add 18 U.S.C. § 3353(b)(2) and to directly amend the Sentencing Guidelines.  Those amendments prohibited all departures except in a very few circumstances which are not present in this case.  See U.S.S.G. §§ 5K2.0. and 5K2.20 (Nov. 2003).  Those amendments also prohibited departures on both of the bases which Jahagirdar advances in his departure argument.

Absent the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2005), the PROTECT Act provisions would not be directly applicable to this case because of *ex post facto* concerns. See gen. California Department of Corrections v. Morales, 514 U.S. 499, 504 (1995).[3]  However, now that the Sentencing Guidelines are advisory rather than mandatory, there is some question as to whether amendments to the Guidelines are so disadvantageous to a defendant so as to raise constitutional *ex post facto* issues.

---

[3] The offense was committed in 2002 and the PROTECT Act amendments became effective in April 2003.

7

In any event, in determining a reasonable sentence in this case under 18 U.S.C. § 3553, the Court should take into consideration the public's view of the seriousness of the offense and the need to promote respect for the law, as that view is expressed by Congress's passage of the PROTECT Act. See 18 U.S.C. § 3553(a)(2)(A) (sentence must reflect seriousness of offense, promote respect for law, and provide just punishment). As noted above, the PROTECT Act reflects that precisely the kind and extent of departure which Jahagirdar seeks are inconsistent with sound public policy. Both of his bases for departure were rejected by Congress. In addition, the extent of his departure – from 87 months incarceration to 3 months incarceration – far outstrips the 67 percent average departure which drove Congressional action in 2003.

### Defendant's Conduct Not Aberrant

The defendant argues that the Court should substantially reduce his sentence because his sexual abuse of D.S. was an aberration in an otherwise model life. The Court should reject this argument not only because it is contrary to public policy, as noted above, but because the defendant's calculated decision testify falsely at trial, including his attack on D.S.'s credibility and character, should prevent him from obtaining the benefit of this departure.

An aberrant conduct departure, even under the pre-PROTECT Act Sentencing Guidelines, was available only for a single criminal occurrence committed without significant planning, of limited duration, and which represented a marked deviation from an otherwise law-abiding life. See U.S.S.G. § 5K2.20, comment (n.1)(Nov. 2001). In this case, Jahagirdar's post-assault conduct should prevent him from obtaining the benefit of an aberrant conduct departure for several reasons. First, Jahagirdar's perjury at trial constituted a second criminal occurrence; as such, an aberrant conduct departure is unavailable. See United States v. Mikutowicz, 365 F.3d 65, 80 (1st Cir. 2004)(perjury at trial prevented aberrant conduct departure); United States v.

Bradstreet, 135 F.3d 46, 57 (1st Cir.1998)(same); United States v. Castellanos, 355 F.3d 56, 60 (2nd Cir. 2003)(perjured testimony at trial coupled with planning for crime basis for rejecting aberrant conduct departure).[4] Moreover, unlike his offense of conviction, his perjury was the product of considerable planning and consideration. As argued above, his perjury was not the product of confusion or mistake, it was part of a deliberate and calculated strategy not only to discredit the victim's testimony, but to place a significant portion of the blame for the event on the victim. The callousness of this strategy is extraordinary in the context of a sexual abuse trial. While Jahagirdar could have attacked her testimony through cross-examination alone, or could have concocted testimony which simply raised doubts about her statements[5], he instead testified that she not only invited the conduct but attempted to overcome his desire to put an end to the conduct. The detail of his false testimony, and the fact that it went far beyond that which he needed to testify falsely at the victim's expense, should prevent him from obtaining the benefit of an aberrant conduct departure. It cannot be said that his crime of perjury was "committed without significant planning" or that it was "of limited duration." See U.S.S.G. § 5K2.20,

---

[4] The defendant distinguishes Bradstreet and Mikutowicz on two grounds. First, he claims that they were decided before U.S.S.G. § 5K2.20 was promulgated. However, at least one session of this Court has held that the reasoning underlying those decisions applies equally to cases sentenced under U.S.S.G. § 5K2.20. See United States v. Silveira, 297 F.Supp.2d 349, 360 (D.Mass. 2003)(Gertner, J., presiding). Moreover, he claims that only where the original crime is one of dishonesty is trial perjury a bar to the departure. This interprets these cases far too narrowly. An aberrant conduct departure has been unavailable in cases where any additional crime has been committed by a defendant, not just in those cases where the defendant has committed the same crime more than once. See, e.g. U.S.S.G. §§ 5K2.20(4) and (5)(Nov. 2001)(referring to criminal history points for any crime, and any prior federal or state felony conviction).

[5] For instance, Jahagirdar could have claimed that he initiated the contact and that D.S. was awake at the time he did so. This would have been a complete defense to the crimes while also not casting unnecessary aspersions on D.S.'s character. Instead, his testimony was calculated to make D.S.'s conduct look worse than his, by casting her as a sexual aggressor.

comment (n.1)(Nov. 2001).

This Court should also reject Jahagirdar's argument for an aberrant conduct departure because he did nothing to mitigate the effects of his offense. See U.S.S.G. § 5K2.20 comment (n2.E)(efforts to mitigate effects of offense to be taken into consideration); United States v. Bruder, 103 F. Supp. 2d 155, 184 (E.D.N.Y. 2000)(defendant's failure to mitigate effects of his crime and permit cover-up was basis for rejecting aberrant conduct departure) *rev'd on other grounds* United States v. Schwartz, 283 F.3d 76 (2nd Cir. 2002). To the contrary, Jahagirdar substantially exacerbated the harm to the victim by taking the case to trial, at which she would be re-traumatized by testifying, and then testifying falsely in a manner which laid the blame for their interaction squarely on D.S.[6] As outlined above, casting the victim of sexual abuse as someone who "asked for it" strikes at the core of the psychological trauma associated with these types of crimes.

Jahagirdar's decision to testify in a manner which exposed D.S. to additional psychological trauma runs directly counter to his patina of caring and kindness cited by his friends and associates. It is extraordinary that Jahagirdar presses this Court with so many glowing letters of his fine character when the evidence in this case reveals that he not only grabbed the genitals of a woman 30 years younger than he, but he then attempted to use his age, his academic credentials, and a selective recitation of his career, to persuade the jury that D.S. testified falsely at trial. If Jahagirdar is what his letters of support claim him to be, he would not have subjected D.S. to this trial-related trauma in an attempt to avoid incarceration and preserve

---

[6] The government recognizes that Jahagirdar has a right to a trial and a right to testify at that trial. However, the manner in which he exercised those rights in this case should prevent him from obtaining the benefits of a downward departure, just as he can obtain no credit for acceptance of responsibility. See U.S.S.G. § 3E1.1.

his reputation and marriage.

### Community Service

This Court should also reject Jahagirdar's motion for a downward departure for his community service. In short, while his community service is laudable, it is not so extraordinary that it takes him outside of the heartland of the Guidelines. The Guidelines provide that "civic, charitable, or public service, . . . and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.11. Therefore, a defendant's record of charitable work and community service is a permissible but discouraged basis for departure. See United States v. Thurston, 994 F.3d 51, 79-80 (1st Cir. 2004).

While the precise amount of time Jahagirdar volunteered in preparing meals and serving at the Salvation Army is difficult to assess, it appears that Jahagirdar volunteered 5-8 hours per week in these activities.[7] Jahagirdar also indicates that he donates approximately $4,000-$5,000 per year in "money and in-kind contributions" to various organizations.[8] While these efforts are commendable, they are not so extraordinary as to take him outside the guideline range for this offense. For instance, at the time of his arrest in this case, he was making $210,000 per year in salary alone.[9] His "money and in-kind contributions" represent approximately 2% of this salary,

---

[7] The defendant in part relies on his travel time to and from the Andre House in his estimate.

[8] It is not clear whether this includes in-kind services that are accounted for in his description of the hours he devotes to these causes. It is also not clear whether this accounts for meals and fruit he provides at the Andre House and the UMOM centers.

[9] His compensation also appears to have included substantial stock options. He obtained more than $1,000,000 in stock options while working for Vistacare.

and somewhat less if his stock options are taken into consideration. This is not extraordinary, particularly in light of the fact that he was very well-off in absolute terms. See Thurston, 994 F.3d 79-80 (noting that corporate executives in better position to make financial contributions than persons whose day to day needs are more pressing).

In addition, the hours he devoted to serving food to homeless people are commensurate with the amount of time individuals devote to their church groups or coaches devote to their teams, and while commendable, are not atypical or extraordinary. See, e.g. United States v. Neil, 903 F.2d 564, 566 (8th Cir.1990)(coaching teams insufficient); United States v. Haversat, 22 F.3d 790, 796 (8th Cir.1994)(significant community activities not sufficiently extraordinary because business executives have sufficient funds and status to devote time to charitable works); *compare* United States v. Serafini, 233 F.3d 758, 773 -774 (3rd Cir.2000)(extraordinary contributions of money and time).

## Conclusion

Once the defendant's arguments based on aberrant conduct and community service are stripped away, the Court is presented with a substantial amount of information indicating that the defendant had a good character, that he was generous, and that he was devoted to his wife and sons. The general character references need to be treated with great skepticism given Jahagirdar's sexual assault of the victim and his subsequent decision to assault her testimony and to impugn her character through his false testimony. Even if one fully credits these character references, they amount to no more than a discouraged grounds for a departure, and the defendant has not presented facts that would indicate that he is outside of the heartland of other defendants. Certainly granting these letters the type of weight accorded to them by the defendant

runs contrary to the need to avoid unwarranted sentencing disparities.[10]

For the reasons outlined above, the government requests that the Court reject the defendant's arguments for downward departures and impose a sentence consistent with the Guideline sentencing range.

Respectfully submitted,<br>
MICHAEL J. SULLIVAN<br>
United States Attorney

Date: June 17, 2005                          By: /s/ John T. McNeil
                                                 JOHN T. McNEIL
                                                 Assistant U.S. Attorney

---

[10] The defendant notes in a footnote that if prosecuted in state court for this crime, his sentence would be substantially less than that under the federal Sentencing Guidelines. This should not be a consideration in sentencing the defendant because if it were, the primary purpose of the federal guidelines – consistency in sentencing across the country – would be defeated. See United States v. Snyder, 136 F.3d 65, 68-70 (1st Cir.1998); *compare* United States v. Wilkerson, 2005 WL 1355138 *8 (1st Cir. 2005). However, the government disputes as a factual matter that a sentence in state court would be substantially less. The state sentencing guidelines call for a sentence of 5-7 years, without taking into consideration the defendant's perjury. See Massachusetts Sentencing Guidelines (Feb. 1998), Attachment B and Sentencing Guidelines Grid (digital rape guidelines start at a base level 7 without aggravating factors such as violence, and with no criminal history the resultant range is 60-90 months). Anecdotal information from the Suffolk County DA's Office and the Middlesex County DA's Office confirms that a defendant convicted of a digital rape would receive such a sentence. This is commensurate with a federal guideline sentence.